# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ashley Funk; Otis Harrison, a minor,   :
by his guardian Amy Lee; Lilian   :
McIntyre, a minor, by her guardian   :
Jennifer McIntyre; Rekha   :
Dhillon-Richardson, a minor, by her   :
guardian Jaskiran Dhillon; Austin   :
Fortino, a minor, by his guardian Ruth   :
Fortino; Darius Abrams, a minor, by   :
his guardian Elaine Abrams; Kaia   :
Luna Elinich, a minor, by her guardian   :
Arianne Elinich,   :
                    Petitioners   :
   :
           v.   :   No. 467 M.D. 2015
   :   Argued:  June 6, 2016
   :
Tom Wolf, in his official capacity as   :
Governor of Pennsylvania;   :
Pennsylvania Department of   :
Environmental Protection; John   :
Quigley, in his official capacity as   :
Secretary of the Pennsylvania   :
Department of Environmental   :
Protection; Pennsylvania Environmental :
Quality Board; John Quigley, in his   :
official capacity as Chairperson of the   :
Environmental Quality Board;   :
Pennsylvania Public Utility   :
Commission; Gladys M. Brown, in   :
her official capacity as Chairperson of   :
the Public Utility Commission;   :
Pennsylvania Department of   :
Conservation and Natural Resources;   :
Cindy Adams Dunn, in her official   :
capacity as Secretary of the   :
Pennsylvania Department of   :
Conservation and Natural Resources;   :
Pennsylvania Department of   :
Transportation; Leslie S. Richards, in   :
her official capacity as Secretary of the   :
Pennsylvania Department of   :

Transportation; Pennsylvania            :
Department of Agriculture; Russell C.    :
Redding, in his official capacity as     :
Secretary of the Department of           :
Agriculture,                             :
                           Respondents   :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE JAMES R. COLINS, Senior Judge


OPINION
BY JUDGE COHN JUBELIRER                 FILED: July 26, 2016


Before this Court in our original jurisdiction are the Preliminary Objections (POs) of the Pennsylvania Public Utility Commission (PUC) and Gladys M. Brown, in her official capacity as Chairperson of the PUC, (PUC Respondents) and the separately filed POs of Tom Wolf, in his official capacity as Governor of Pennsylvania, and various Executive Branch Departments and Secretaries acting in their official capacities (Executive Branch Respondents) to the "Second Amended Petition for Review Seeking Declaratory and Mandamus Relief" (Petition) of Ashley Funk, et al. (Petitioners).[1] Petitioners seek various forms of declaratory and mandamus relief with the goal of requiring PUC and Executive Branch Respondents (together, Respondents) "to develop a comprehensive plan" and to regulate "Pennsylvania's emissions of carbon dioxide ('$CO_2$') and other greenhouse gases ('GHGs')" in a comprehensive manner that is "consistent

---

[1] The Petitioners include: Ashley Funk; Otis Harrison, a minor, by his guardian Amy Lee; Lilian McIntyre, a minor, by her guardian Jennifer McIntyre; Rekha Dhillon-Richardson, a minor, by her guardian Jaskiran Dhillon; Austin Fortino, a minor, by his guardian Ruth Fortino; Darius Abrams, a minor, by his guardian Elaine Abrams; and Kaia Luna Elinich, a minor, by her guardian Arianne Elinich.

with[,] and in furtherance of[,] the Commonwealth's duties and obligations under Article I, Section 27" of the Pennsylvania Constitution.  Pa. Const. art. I, § 27. (Petition ¶ 1.)  Petitioners allege that by not developing and implementing a comprehensive plan to regulate $CO_2$ and GHGs in light of the present and projected deleterious effects of global climate change, Respondents have not fulfilled their constitutional obligations to not infringe upon the rights granted to the people by the Constitution and have not adequately acted as trustees of the Commonwealth's public natural resources, including the atmosphere.  (Id.)  The Executive Branch Respondents object to the Petition through 12 POs and the PUC Respondents filed an additional 7 POs.  For the reasons that follow, we sustain the Respondents' POs in part and dismiss the Petition.

## I.    THE ENVIRONMENTAL RIGHTS AMENDMENT

The claims asserted in this action relate to the rights granted to citizens of Pennsylvania by Article I, Section 27 of the Pennsylvania Constitution, commonly referred to as the "Environmental Rights Amendment" (ERA) and the respective obligations imposed upon the Commonwealth by the same.  The ERA provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment.  Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27.  The first sentence of the ERA (first provision) endows the people of Pennsylvania with the **right** to the described resources.  Cmty. Coll. of Delaware Cnty. v. Fox, 342 A.2d 468, 473 (Pa. Cmwlth. 1975).  The rights to

2

"clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment," like all rights established in Article I of the Pennsylvania Constitution, prevent the state from acting in ways that would infringe upon such rights. Com. by Shapp v. Nat'l Gettysburg Battlefield Tower, Inc., 311 A.2d 588, 592 (Pa. 1973). The second and third sentences (second provision) establish "that the Commonwealth is the 'trustee' of Pennsylvania's 'public natural resources.'" Id. We have said, with regard to the second provision, that the intent of the ERA is "to place Pennsylvania's 'public natural resources' in trust and to impose a **duty** on the Commonwealth, as trustee, to '*conserve and maintain* them for the benefit of all the people.'" Pa. Envtl. Def. Found. v. Commonwealth, 108 A.3d 140, 167 (Pa. Cmwlth. 2015) (quoting the ERA) (emphasis added). A legal challenge asserting the rights established in the ERA "may proceed upon alternate theories that either the government has infringed upon citizens' rights or the government has failed in its trustee obligations, or upon both theories." Id. at 156. (quoting Robinson Twp., Washington Cnty. v. Commonwealth, 83 A.3d 901, 950-51 (Pa. 2013) (plurality).

While expansive in its language, the ERA was not intended to be read in absolutist terms so as to prohibit development that enhances the economic opportunities and welfare of the people currently living in Pennsylvania. Payne v. Kassab, 361 A.2d 263, 273 (Pa. 1976) (hereinafter, "Payne II"); see also Robinson Twp., 83 A.3d at 958 ("the duties to conserve and maintain [public natural resources] are tempered by legitimate development tending to improve upon the lot of Pennsylvania's citizenry"). Instead, the ERA places policymakers in the "constant and difficult" position of "weighing conflicting environmental and social concerns" and "in arriving at a course of action that will be expedient as well as

3

reflective of the high priority which constitutionally has been placed on the conservation of our natural, scenic, esthetic and historical resources." Payne v. Kassab, 312 A.2d 86, 94 (Pa. Cmwlth. 1973) (hereinafter, "Payne"). To this end, we recently described the ERA as "a thumb on the scale, giving greater weight to the environmental concerns in the decision-making process" when "environmental concerns of development are juxtaposed with economic benefits of development." Pa. Envtl. Def. Found., 108 A.3d at 170.

Judicial review of governmental decisions implicating the ERA "must be realistic and not merely legalistic." Payne, 312 A.2d at 94. In Payne, we established a three-fold test to determine whether a government decision complies with the ERA.

> (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?

Id.[2]

---

[2] In Robinson Township, a plurality of the Pennsylvania Supreme Court stated that, in contrast to conducting a **realistic analysis** discussed in Payne, "the courts must conduct a **principled analysis** of whether the [ERA] has been violated." Robinson Twp., 83 A.3d at 951 (emphasis added). The plurality also criticized the three-fold test established by this Court in Payne when it stated:

> [T]he Payne test appears to have become, for the Commonwealth Court, the benchmark for Section 27 decisions in lieu of the constitutional text. In its subsequent applications, the Commonwealth Court has indicated that the viability of constitutional claims premised upon the Environmental Rights Amendment was limited by whether the General Assembly had acted and by the General Assembly's policy choices, rather than by the plain language of the amendment.

*(Continued…)*

4

The Payne test is particularly applicable in situations where a person challenges a government decision or action. This test is somewhat less satisfying when, as here, a person alleges that the government failed to affirmatively engage in an action required by its trusteeship duties under the ERA's second provision. When confronted with such allegations, the Supreme Court's discussion in Payne II is helpful, where the Court explained:

> There can be no question that the Amendment itself declares and creates a public trust of public natural resources for the benefit of all the people (including future generations as yet unborn) and that the Commonwealth is made the trustee of said resources, commanded to

---

But, while the Payne test may have answered a call for guidance on substantive standards in this area of law and may be relatively easy to apply, the test poses difficulties both obvious and critical. First, the Payne test describes the Commonwealth's obligations—both as trustee and under the first clause of Section 27—in much narrower terms than the constitutional provision. Second, the test assumes that the availability of judicial relief premised upon Section 27 is contingent upon and constrained by legislative action. And, finally, the Commonwealth Court's Payne decision and its progeny have the effect of minimizing the constitutional duties of executive agencies and the judicial branch, and circumscribing the abilities of these entities to carry out their constitutional duties independent of legislative control. The branches of government have independent constitutional duties pursuant to the [ERA], as these duties are interpreted by the judicial branch and this Court in particular. **Because of these critical difficulties, we conclude that the non-textual Article I, Section 27 test established in Payne and its progeny is inappropriate to determine matters outside the narrowest category of cases, i.e., those cases in which a challenge is premised simply upon an alleged failure to comply with statutory standards enacted to advance Section 27 interests.**

Id. at 966-67 (emphasis added) (citations and parentheticals omitted).

Because the above portion of the lead opinion in Robinson Township did not garner a majority of the Supreme Court, the plurality's rejection of the analytical framework discussed in Payne and its progeny is not binding precedent. Pa. Envtl. Def. Found., 108 A.3d at 159. "For our purposes, we find the plurality's construction of [the ERA] persuasive only to the extent it is consistent with binding precedent from this Court and the Supreme Court on the same subject." Id. at 156 n.37.

5

conserve and maintain them. . . . But merely to assert that one has a common right to a protected value under the trusteeship of the State, and that the value is about to be invaded, creates no automatic right to relief. The [ERA] speaks in no such absolute terms. The Commonwealth as trustee, bound to conserve and maintain public natural resources for the benefit of all the people, is also required to perform other duties, such as the maintenance of an adequate public highway system, also for the benefit of all the people.

Payne II, 361 A.2d at 272-73. Because it is the Commonwealth, not individual agencies or departments, that is the trustee of public natural resources under the ERA, and the Commonwealth is bound to perform a host of duties beyond implementation of the ERA, the ERA must be understood in the context of the structure of government and principles of separation of powers. In most instances, the balance between environmental and other societal concerns is primarily struck by the General Assembly, as the elected representatives of the people, through legislative action. See Nat'l Solid Wastes Mgmt. Ass'n v. Casey, 600 A.2d 260, 265 (Pa. Cmwlth. 1991), aff'd, 619 A.2d 1063 (Pa. 1993) (holding that the Governor can only execute laws and the balance required by the ERA was achieved through legislative enactments). While executive branch agencies and departments are, from time to time, put in the position of striking the balance themselves, they do so only after the General Assembly makes "basic policy choices" and imposes upon the agencies or departments "the duty to carry out the declared legislative policy in accordance with the general provisions of the statute." MCT Transp. Inc. v. Phila. Parking Auth., 60 A.3d 899, 904 (Pa. Cmwlth.), aff'd sub nom. MCT Transp., Inc. v. Phila. Parking Auth., 81 A.3d 813 (Pa.), and aff'd sub nom. MCT Transp., Inc. v. Phila. Parking Auth., 83 A.3d 85 (Pa. 2013) (quotation omitted). The second provision of the ERA impels executive branch agencies and departments to act in support of conserving and maintaining

6

public natural resources, but it cannot operate on its own to "expand the powers of a statutory agency . . . ." Cmty. Coll. of Delaware Cnty., 342 A.2d at 482. Thus, courts assessing the duties imposed upon executive branch departments and agencies by the ERA must remain cognizant of the balance the General Assembly has already struck between environmental and societal concerns in an agency or department's enabling act. Id. at 473.

## II. PETITIONERS' ALLEGATIONS

Petitioners allege a series of facts related to the "overwhelming scientific consensus that human-caused climate change is occurring" and that humans can mitigate the effects of climate change by restricting activities that discharge GHGs and encouraging activities that remove $CO_2$ from the atmosphere. (Petition ¶¶ 35-41.) Petitioners also allege that "climate change is already damaging human and natural systems" across the globe and in Pennsylvania. (Id. at ¶¶ 42, 54.) According to the allegations:

> 54. The effects of climate change are already occurring in Pennsylvania and are projected to significantly impact the Commonwealth in the future. In the past 110 years, the overall temperature in Pennsylvania has increased by 1.3°C (2.4°F) due to anthropogenic [GHG] emissions.
>
> 55. Climate change is already disrupting the hydrological cycle in Pennsylvania and continued climate change wi[ll] lead to greater disruptions. Pennsylvania is already experiencing an increase in heavy precipitation events, a decrease in snow cover, a decrease in summer runoff, a decrease in summer and fall soil moisture, and an increase in short- and medium-term soil moisture droughts. Rising stream temperatures could also degrade water quality. Additionally, rising sea levels causes degradation of fresh groundwater supplies due to saltwater intrusion.

7

56. If the atmospheric concentration of $CO_2$ rises to 450 ppm[,] sea levels are expected to rise at least 6-8 meters. This would be a major disruption to the Delaware River and Estuary, wetlands and parks along the river, and would inundate significant portions of Philadelphia, including the Philadelphia International Airport, Citizens Bank Park, the Philadelphia Navy Yard, the Philadelphia CSX rail yard, and numerous neighborhoods and other businesses.

57. Rising temperatures are degrading, diminishing, and depleting the water quality and quantity of streams, rivers, and wetlands leading to a decrease in biodiversity. Some wetlands may also disappear due to increased evaporation and transpiration and longer dry periods. Increased water temperatures will degrade, diminish, and deplete cold-water aquatic species like brook trout while leading to an increase in invasive species.

58. Climate change is degrading, diminishing, and depleting Pennsylvania's forests and leading to species composition shifts, greater tree stress, shifts in regeneration rates, more tree mortality, and increases in insect, disease, and invasive species activities.

59. Higher temperatures contribute to heat-related deaths and also lead[] to increased formation of ground-level ozone. Ozone is linked to adverse health impacts including asthma, respiratory infections, increased mortality, and wheezing. Other health impacts associated with climate change may include an increase in people su[ff]ering from allergies as pollen increases.

60. Without immediate science-based reductions in $CO_2$ and other GHGs, there is an immediate and substantial danger that within Youth [Petitioners] lives, higher temperatures, water and food shortages, droughts, floods, extreme weather events, sea level rise, and other climate impacts will make significant portions of Pennsylvania unfit to live in and will threaten the very survival of Pennsylvania citizens. This is not a distant threat but one that will be realized in the coming decades unless the Commonwealth acts with urgency to do its part to reduce $CO_2$ and GHG emissions and restore the atmosphere.

(Id. at ¶¶ 54-60.) Petitioners allege that the consumption of fossil fuels within Pennsylvania substantially contributes to climate change and ocean acidification and cite to data from the United States Energy Information Agency stating that if

8

Pennsylvania was a country, it would be the 26th largest emitter of GHGs in the world. (Id. at ¶¶ 61, 64.)

In order to combat climate change and stabilize GHGs in the atmosphere, Petitioners allege that the current science confirms that humans must reduce $CO_2$ concentrations to 350 parts per million (ppm) or less by the end of the current century. (Id. at ¶¶ 66-67.) According to Petitioners' allegations, further delay in reducing $CO_2$ concentrations in the atmosphere will make it "harder for [Petitioners] and future generations to protect a livable world" and that current climate change legislation and policy are not in line with achieving the goal of reducing $CO_2$ levels to 350 ppm by the end of the century. (Id. at ¶¶ 71, 74.) Petitioners allege, based on current scientific projections, that "[i]t is imperative that Respondents calibrate state emission limits to put Pennsylvania on a trajectory aimed for 350 ppm and then establish a plan that will put Pennsylvania on track towards ensur[ing] that Pennsylvania does its part to meet these limits." (Id. at ¶ 71.)

With these factual allegations as predicate, Petitioners allege that the ERA bestows upon them rights that must be protected by Respondents and that the Commonwealth owes to them a fiduciary duty as public trustee to conserve and maintain "clean air and safe levels of $CO_2$ and GHGs in accordance with current climate science." (Id. at ¶ 88.) Specifically, Petitioners allege that Respondents have not carried out their mandatory duty under the ERA to conduct various "stud[ies], investigation[s], or [any] other analysis" related to how the rights secured by the ERA are to be protected, and how the Commonwealth's obligations as a trustee of the public trust are to be fulfilled "in light of climate change and/or increasing concentration of $CO_2$ and GHGs in the atmosphere." (Id. at ¶¶ 90 (a)-

9

(c), (e)-(g).) Petitioners further allege that Respondents have not carried out their mandatory duty to propose, promulgate, or issue executive orders or regulations governing how the rights secured by the ERA are to be protected and have not issued any similar regulations or executive orders limiting emissions of $CO_2$ and GHGs in a **comprehensive manner** to protect the rights secured by the first provision of the ERA or to satisfy their duties as trustees of the public trust pursuant to the second provision of the same. (Id. at ¶¶ 90 (d), (h)-(j).) As a result of Respondents' failure take necessary action, Petitioners assert that they have been, and will continue to be, injured and that their constitutional rights have been violated.

Petitioners request that we remedy the above harms and constitutional violations by issuing a writ of mandamus requiring Respondents to:

> a. conduct — either individually or in combination with one or more other Respondents — a study, investigation, or other analysis to determine how the rights to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment secured by the first [provision of the ERA] have been, are being, or in the future may be impacted by climate change and/or increasing concentrations of $CO_2$ and GHGs in the atmosphere;

> b. conduct — either individually or in combination with one or more other Respondents — a study, investigation, or other analysis to determine what actions that the Respondents can take to protect the rights to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment secured by the first [provision of the ERA] in light of climate change and/or increasing concentrations of $CO_2$ and GHGs in the atmosphere;

> c. conduct — either individually or in combination with one or more other Respondents — a study, investigation, or other analysis to determine whether any actions that the Respondents have taken or will take are contrary to the rights to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment secured by the first [provision of the ERA] in light of

climate change and/or increasing concentrations of $CO_2$ and GHGs in the atmosphere;

d. promulgate by regulation, executive order, or other official action setting forth a process for the rights to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment secured by the first [provision of the ERA] are to be considered, accounted for, or applied in decisions being made by the Respondent;

e. conduct — either individually or in combination with one or more other Respondents — a study, investigation, or other analysis to determine what actions are necessary to conserve and maintain public natural resources, including the atmosphere, in light of climate change and/or increasing concentrations of $CO_2$ and GHGs in the atmosphere in order to satisfy their obligations as trustees of the public trust created in the second [provision of the ERA];

f. conduct — either individually or in combination with one or more other Respondents — a study, investigation, or other analysis to determine what actions that the Respondents can take to conserve and maintain public natural resources, including the atmosphere, in light of climate change and/or increasing concentrations of $CO_2$ and GHGs in the atmosphere in order to satisfy their obligations as trustees of the public trust created in the second [provision of the ERA];

g. promulgate by regulation, executive order, or other official action setting forth a process for the obligations to conserve and maintain public natural resources, the duties of loyalty, impartiality, and/or to exercise ordinary skill, prudence, and caution in managing the public trust assets as trustee of the public trust created in the second [provision of the ERA] are to be considered, accounted for, or applied in decisions being made by the Respondent;

h. prepare comprehensive regulations, in accordance with the current science, designed to account for embedded emissions and reduce carbon dioxide and other greenhouse gas emissions to safe levels and thereby reach the concentrations that must be achieved to satisfy their constitutional obligations as public trustees of the air and atmosphere;

i. implement regulations that will in fact reduce carbon dioxide and other greenhouse gas emissions to safe levels and thereby reach the concentrations that must be achieved to satisfy their constitutional obligations as public trustees of the air and atmosphere;

(Petition, Request for Relief ¶¶ 7 (a)-(i) (Mandamus Request).)  Petitioners further seek the following forms of declaratory relief:

1.  Declare that an atmosphere with safe levels of $CO_2$ and GHGs is part of the right to clean air recognized in the first [provision of the ERA];

2.  Declare that the atmosphere is a public natural resource falling within the public trust established by [the second provision of the ERA];

3.  Declare each Respondent, as an agency or agent of the Commonwealth, has a duty to not act contrary to the fundamental right to clean air, pure water, and to the preservation of natural, historic, and esthetic values of the environment recognized in the first [provision of the ERA];

4.  Declare that each named Respondent, as an agency or agent of the Commonwealth, have [sic] public trustee duties to protect the atmosphere and other public natural resources pursuant to the public trust established by [the second provision of the ERA];

5.  Declare each Respondent, as an agency or agent of the Commonwealth, has failed to meet Respondent's duty to not act contrary to the fundamental right to clean air, pure water, and to the preservation of natural, historic, and esthetic values of the environment recognized in the first [provision of the ERA] with respect to [$CO_2$] and other [GHG] emissions;

6.  Declare that each named Defendant, as an agency or agent of the Commonwealth, has failed to meet the public trustee duties established by the second [provision of the ERA] with respect to [$CO_2$] and other [GHG] emissions.

(Id. at ¶¶ 1-6.)[3]

---

[3] Petitioners also seek costs, reasonable attorney's fees, and other relief the court may deem just and proper.  (Petition, Request for Relief ¶¶ 8-9.)

12

While Petitioners allege that $CO_2$ concentrations in the atmosphere above 350 ppm are unsafe and will make it harder for Petitioners to protect a livable world, (Petition ¶¶ 70-71), Petitioners stress that their Petition

> **does not seek to have this Court require Respondents to implement any particular set of regulations**; rather, it asks this Court – via declaratory and mandamus relief – to require Respondents to determine what steps are necessary to conserve and maintain the public natural resources, including the atmosphere, in the face of climate change via regulation of $CO_2$ and GHGs, develop a comprehensive plan to achieve those necessary steps, and to implement the comprehensive plan via regulations of $CO_2$ and GHG emissions in order to satisfy the constitutional mandate in [the ERA] and thereby protect Petitioners as [ERA] beneficiaries.

(Petition ¶ 1 (emphasis in original).)

## III.   RESPONDENTS' POs

Executive Branch Respondents object to the Petition through 12 POs and the PUC Respondents assert an additional 7 POs. For the purpose of this opinion, we will merge duplicative POs and construe the POs as asserting 10 distinct objections that we have organized in the following manner for ease of discussion.

Executive Branch Respondents first challenge this Court's jurisdiction on the basis that Petitioner Funk previously filed a rulemaking petition with the Environmental Quality Board (EQB) on September 5, 2013, that is nearly identical to the instant matter, which was denied and not subsequently appealed. (Executive Branch Respondents' POs (Exec. Branch POs) ¶ 49.) Executive Branch Respondents contend that the current action is a collateral attack on the EQB ruling and that absent a timely appeal to this Court in its appellate jurisdiction, this Court

lacks jurisdiction to entertain the Petition in its original jurisdiction. (Id. at ¶¶ 52-54, 115-18.)

Respondents next allege that Petitioners lack standing to assert their claims because the harm they allegedly suffer is remote, speculative, and generalized, and the interest they assert does not surpass the common interest of all citizens who have a general interest in the government obeying the law. (PUC POs ¶¶ 39-43; Exec. Branch POs ¶¶ 131-33.)

Third, Respondents assert that Petitioners cannot obtain mandamus relief as the Petition does not allege facts necessary to satisfy the required elements of mandamus relief. (PUC POs ¶ 51.) Central to Respondents' argument is an allegation that mandamus cannot be used to require the exercise of discretion in any particular way, and Respondents understand the Petition as demanding Respondents promulgate and implement regulations Petitioners think are necessary. (Id. at ¶¶ 53-58.) Respondents further argue that mandamus will not lie because alternative relief is available through a rulemaking petition to the Department of Environmental Protection (DEP) or appeal of the previously rejected decision of the EQB. (Id. at ¶ 59; Exec. Branch POs ¶¶ 104-106.) Executive Branch Respondents also allege that mandamus relief is not appropriate when the writ will be futile, and here, requiring Respondents to act a particular way in isolation from global and national regulators would not remedy the harms alleged or lessen the threat of climate change. (Exec. Branch POs ¶ 110.)

Fourth, the Executive Branch Respondents allege that the current action is barred by the doctrine of exhaustion of administrative remedies and that Petitioners do not fall under a recognized exception to the doctrine. (Id. at ¶¶ 87, 98-99.) Executive Branch Respondents allege that, with the exception of Petitioner Funk,

no other Petitioner has filed a rulemaking petition, and that the EQB has the discretion to grant a subsequent petition from Petitioner Funk. (Id. at ¶¶ 89-91.)

Fifth, both Respondents demur to the allegations in the Petition. Executive Branch Respondents, relying on the Payne test, contend that Petitioners have not alleged sufficient facts showing that Respondents did not comply with existing laws or regulations, did not make a reasonable effort to reduce $CO_2$ and GHG emissions, or that the harm of any decision outweighs the benefits derived from such decisions. (Id. at ¶¶ 59-62.) Respondents further allege that the relief sought by Petitioners is already being carried out by Respondents through a variety of programs and strategies, including, but not limited to, the 2009 Climate Impacts Assessment Report and Climate Change Action Plan. (Id. at ¶¶ 64-66; PUC POs ¶¶ 90-100.)

Respondents next allege that the Petition lacks specificity. PUC Respondents contend that the Petition does not allege any facts particular to the PUC Respondents, nor state within any specificity how the PUC Respondents actions or inactions were unlawful. (PUC POs ¶¶ 82-85.) Similarly, Executive Branch Respondents allege that the Petition "do[es] not articulate the specific actions each of the Respondents are engaged in or how they injured [Petitioners]." (Exec. Branch POs ¶ 142.)

Seventh, Respondents contend that some of the Respondents are improper parties to the action. Executive Branch Respondents allege that Governor Tom Wolf, the Department of Conservation and Natural Resources (DCNR), the Department of Transportation, Department of Agriculture, the PUC, and Secretaries Dunn, Richards, and Redding, as well as Chairperson Brown, are not proper parties because their interests are fully represented by DEP and its

15

Secretary, John Quigley,[4] who also serves as Chair of the EQB. (Id. at ¶¶ 159-60.) Executive Branch Respondents argue that none of the above parties "have statutory or regulatory authority to regulate $CO_2$ or GHGs as part of their official duties," and "[t]o include them … is unnecessary and duplicative." (Id. at ¶ 162.) The PUC Respondents echo the Executive Branch Respondents' allegations and contend that the PUC has no authority to regulate $CO_2$ or GHGs and that DEP, the EQB, and Secretary Quigley are the proper parties. (PUC POs ¶¶ 30-34.)

Eighth, Respondents assert the affirmative defense of sovereign immunity. Citing to Fawber v. Cohen, 532 A.2d 429, 433-34 (Pa. 1987), Respondents allege that the doctrine of sovereign immunity bars suits that "seek to *compel affirmative action on the part of state officials*." (Exec. Branch POs ¶ 121; PUC POs ¶ 63 (emphasis in original).) According to the PUC's POs, because Petitioners seek an order requiring "Respondents to promulgate regulations, adopt specific policies, and generally perform their duties in the way that Petitioners want," the Petition cannot clear the bar of sovereign immunity. (PUC POs ¶ 65.)

Ninth, Respondents allege that declaratory relief is improper because it would amount to "advisory opinions which can have 'no practical effect on the parties.'" (Exec. Branch POs ¶ 124 (quoting Swift v. Dep't. of Transp., 937 A.2d 1162, 1169 (Pa. Cmwlth. 2007)).) Respondents allege that the declaratory relief sought would not tell Respondents what needs to be done to satisfy their trustee obligation because the Commonwealth is bound to both conserve public natural resources and do other things also for the benefit of the people. (Id. at ¶ 127.) According to the PUC, because Petitioners' claims for declaratory relief have no

---

[4] John Quigley resigned as Secretary of DEP on May 20, 2016. Patrick McDonnell currently serves as Acting Secretary of DEP.

16

practical effect, they should "fall along with the [mandamus] claim [these claims] serve[] to support." (PUC POs ¶ 67-68 (quoting Stackhouse v. Pa. State Police, 892 A.2d 54, 62 (Pa. Cmwlth. 2006)).)

Finally, Respondents allege that the Petition asks this Court to decide a non-justiciable political question. (Exec. Branch POs ¶ 145; PUC POs ¶ 70.) The PUC asserts that "[t]he continuing development and implementation of [GHG] emission reduction strategies should remain with the executive agencies charged with those responsibilities under the law, as they possess the technical program expertise and scientific background necessary for such regulations." (PUC POs ¶ 76.) According to the Executive Branch Respondents, "[c]ourts do not possess the scientific and technological expertise to evaluate the current science and to make conclusions, which would amount to policy determinations, based on their evaluations and therefore cannot resolve the dispute in the way intended by [Petitioners]." (Exec. Branch POs ¶ 150.)

## IV. DISCUSSION

In assessing the POs, we are mindful that "this Court must accept as true all well-pleaded allegations of material facts in the [Petition], as well as all of the inferences reasonably deducible from those facts." Funk v. Dep't of Envtl. Prot., 71 A.3d 1097, 1101 n.4 (Pa. Cmwlth. 2013). A PO will only be sustained where it "appear[s] with certainty that the law will permit no recovery" and "[a]ny doubt must be resolved in favor of the non-moving party." Guarrasi v. Scott, 25 A.3d 394, 400 n.5 (Pa. Cmwlth. 2011).

### A. Jurisdiction

17

Whether this Court has subject matter jurisdiction over a petition for review is a threshold matter that must be addressed prior to considering any of the issues asserted therein. Borough of Olyphant v. Pa. Pub. Util. Comm'n, 861 A.2d 377, 382 n.10 (Pa. Cmwlth. 2004). Executive Branch Respondents argue that this Court lacks subject matter jurisdiction over the Petition because it is not vested with authority to engage in rulemaking or to compel specific rulemaking. Executive Branch Respondents contend that "this Court's original jurisdiction is limited to items that are *not* in its appellate jurisdiction." (Executive Branch Respondents' Brief (Exec. Branch Br.) at 21 (citing Pa. Dept. of Aging v. Lindberg, 469 A.2d 1012, 1017-18 (Pa. 1983)).) Thus, it is the Executive Branch Respondents' contention that because a petitioner may file a rulemaking petition with the EQB pursuant to Section 1920-A(h) of the Administrative Code of 1929[5] and this Court has appellate jurisdiction over final orders of the EQB, this Court cannot exercise original jurisdiction over suits requesting rulemaking.

Petitioners argue in response that their action asserts "classic mandamus relief" based on Respondents' failure to perform their duties mandated by the ERA, which is within this Court's jurisdiction. Petitioners assert that the Executive Branch Respondents' objection rests on an improper understanding of the relief sought. Petitioners contend that they do not request that this Court impose any specific regulatory regime; rather, they ask this Court to require

---

[5] Act of April 9, 1929, P.L. 177, as amended, 71 P.S. § 510-20(h). Section 1920-A was added by the Act of December 3, 1970, P.L. 834, 71 P.S. § 510-20(h). Section 1920-A(h) provides: "Any person may petition the Environmental Quality Board to initiate a rule making proceeding for the issuance, amendment or repeal of a regulation administered and enforced by the department." Id.

Respondents to develop approaches in a manner determined by Respondents that will ensure that Petitioners' constitutional rights under the ERA are protected.

Pursuant to Section 761(a)(1) of the Judicial Code, this Court has "original jurisdiction of all civil actions or proceedings . . . [a]gainst the Commonwealth government, including any officer thereof." 42 Pa. C.S. § 761(a).[6] Further Section 761(c) provides this Court with original jurisdiction "in cases of mandamus and prohibition to . . . other government units where such relief is ancillary to matters within its appellate jurisdiction." 42 Pa. C.S. § 761(c). This Court's appellate jurisdiction is set forth in Section 763(a) of the Judicial Code, which provides:

> Except as [not relevant here], the Commonwealth Court shall have exclusive jurisdiction of appeals from final orders of government agencies in the following cases:
>
> (1) All appeals from Commonwealth agencies under Subchapter A of Chapter 7 of Title 2 (relating to judicial review of Commonwealth agency action) or otherwise and including appeals from the Board of Claims, the Environmental Hearing Board, the Pennsylvania Public Utility Commission, the Unemployment Compensation Board of Review and from any other Commonwealth agency having Statewide jurisdiction.
>
> (2) All appeals jurisdiction of which is vested in the Commonwealth Court by any statute hereafter enacted.

42 Pa. C.S. § 763(a). In construing these provisions, the Pennsylvania Supreme Court has said:

---

[6] Section 761(a)(1)(i)-(v) provides for certain exceptions to this Court's original jurisdiction, none of which are relevant here.

those matters our legislature has placed within Commonwealth Court's appellate jurisdiction under Section 763 are excluded from its original jurisdiction under Section 761(a)(1). In short, the Commonwealth Court's original jurisdiction of actions against the Commonwealth is limited to those not within its Section 763 appellate jurisdiction over appeals from Commonwealth agencies, whether directly under Section 763(a)(1) or (2), indirectly under Section 762(a)(3) or (4) or otherwise within its appellate jurisdiction.

Lindberg, 469 A.2d at 1015-16.

Whether we have jurisdiction over the instant action, therefore, turns on whether we would have appellate jurisdiction over the matter. While we agree that we would have appellate jurisdiction over a final order of the EQB denying a rulemaking petition pursuant to Section 1920-A(h) of the Administrative Code of 1929, and a final order of the Environmental Hearing Board (EHB) denying an appeal of a DEP decision to not submit a rulemaking petition to the EQB pursuant to Section 4 of the Environmental Hearing Board Act,[7] we would not have appellate jurisdiction over the instant matter. According to DEP's regulations, a successful rulemaking petition must include either "[s]uggested regulatory language if the petition requests that the EQB adopt or amend regulations," or "[a] specific citation to the regulations to be repealed if the petition requests that the EQB repeal existing regulations." 25 Pa. Code § 23.1(a)(2). Petitioners would not be able to file a successful rulemaking petition based on the allegations before us because they do not seek the enactment of a specific regulation or repeal of an existing regulation.[8] Rather, Petitioners ask that we order the EQB to enact

---

[7] Act of July 13, 1988, P.L. 530 § 4, as amended, 35 P.S. § 7514.

[8] This is in contrast to a previous Rulemaking Petition filed by Petitioner Funk. Ms. Funk submitted a rulemaking petition on September 5, 2013, requesting the EQB promulgate a regulation reducing the amount of $CO_2$ emitted from fossil fuel burning by at least six percent per

*(Continued…)*

20

whatever regulation EQB deems to be required to satisfy the ERA after conducting appropriate studies discovering what would be required to protect Petitioners' rights in light of the threat of climate change. The only court in which Petitioners could try to seek such a remedy, if one is available at all, is in this Court's original jurisdiction. 42 Pa. C.S. § 761(b) (providing that the original jurisdiction of this Court "shall be exclusive except as provided in [sections not relevant here]"). We therefore overrule Executive Branch Respondents' preliminary objection alleging that this Court lacks subject matter jurisdiction over the Petition.

### B. Standing

We next address Respondents' challenge to Petitioners' standing, where Respondents contend that the Petition merely asserts generalized injuries and claims based upon remote and speculative allegations of harm. "When determining whether [a party has] standing to challenge the legality of an action, it must be assumed that the action is in fact contrary to some rule of law." Wm. Penn Parking Garage, Inc. v. City of Pittsburgh, 346 A.2d 269, 287 n.32 (Pa. 1975). The "core concept [of standing] is that a person who is not adversely affected in any way by the matter he seeks to challenge is not 'aggrieved' thereby and has no standing to obtain a judicial resolution of his challenge." Id. at 280. A person is sufficiently aggrieved under Pennsylvania's prudential standing requirement "if he can establish that he has a **substantial, direct[,] and immediate** interest in the

---

year through 2050. (Petition ¶ 6; Exec. Branch POs at App. 1, p. 3) Ms. Funk also filed an almost identical rulemaking petition in 2012, which was addressed by this Court in Funk v. Department of Environmental Protection, 71 A.3d 1097 (Pa. Cmwlth. 2013).

21

outcome of the litigation." Fumo v. City of Philadelphia, 972 A.2d 487, 496 (Pa. 2009) (emphasis added).

"A party has a **substantial** interest in the outcome of litigation if his interest surpasses that of all citizens in procuring obedience to the law." Id. (quotation omitted) (emphasis added). While the harm alleged must be substantial, it need not be pecuniary in nature. See Wm. Penn Parking, 346 A.2d at 281 n.20 (quoting Sierra Club v. Morton, 405 U.S. 727, 734 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.")). An interest is **direct** if there is a causal connection between the matter complained of and the harm alleged. Fumo, 972 A.2d at 496 (quotation omitted). An interest is **immediate** when the "causal connection is not remote or speculative." Id.

While Pennsylvania's prudential standing requirement differs from standing under Article III of the United States Constitution as applied in federal courts, Pennsylvania courts often look to federal standing decisions for guidance. Id. at 500 n.5. The United States Supreme Court has long "held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 183 (2000) (internal quotation marks omitted); see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 562-63 (1992) ("the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"); Sierra Club, 405 U.S. at

22

734 ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society").  Moreover, federal precedent is clear that "the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."  Id.; see also Massachusetts v. Envtl. Prot. Agency, 549 U.S. 497, 522 (2007) ("That . . . climate-change risks are 'widely shared' does not minimize Massachusetts' interest in the outcome of this litigation"); United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 688 (1973) ("To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody.  We cannot accept that conclusion.").

In Friends of the Earth, the United States Supreme Court addressed a citizen suit authorized by Section 505(a) of the federal Clean Water Act.[9]  The petitioner alleged that by discharging pollutants into a waterway, the defendant violated the Clean Water Act and the conditions of its discharge permit issued by the state

---

[9] 33 U.S.C. § 1365(a).  Pursuant to Section 505(a):

> any citizen may commence a civil action on his own behalf--
> **(1)** against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or
> **(2)** against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

Id.

23

department of health. <u>Friends of the Earth</u>, 528 U.S. at 176. The petitioner averred that it had standing as an association because some of its members have standing. <u>Id.</u> at 181-82. One of its members alleged that he lived close to the waterway and that it smelled polluted as he drove by. <u>Id.</u> The member also alleged that he liked to fish, camp, swim, and picnic by the river, and that he would not do so now due to the discharges. <u>Id.</u> at 182. Other members alleged that they liked to walk, birdwatch, and hike near the waterway, but would no longer do so. <u>Id.</u> The Court held that the association had standing based on the averments of its individual members. <u>Id.</u> at 183. According to the Court,

> We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area **and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity** . . . . [T]he affidavits and testimony presented by [plaintiff] in this case assert that [defendant's] discharges, and the affiant members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests. These submissions present dispositively more than the mere general averments and conclusory allegations . . .

<u>Id.</u> at 183-84 (quotations omitted) (emphasis added).

The Pennsylvania Supreme Court applied the above principles in <u>Robinson Township</u>.[10] There, the Court addressed an appeal of this Court's decision sustaining, in part, the Commonwealth's preliminary objections to a challenge to Act 13 of 2012, a statute amending the Pennsylvania Oil and Gas Act,[11] by several

---

[10] While much of <u>Robinson Township</u> is non-binding, Section A of the lead opinion addressing standing was supported by a majority of the Supreme Court.

[11] Act of February 14, 2012, P.L. 87, 58 Pa. C.S. §§ 2301 – 3504.

municipalities, two residents and elected officials, a non-profit environmental group and its executive director, and a physician who treats patients allegedly impacted by the challenged activity (together, "citizens"). Relevant to the instant matter, the Commonwealth argued that the harm alleged by the citizens is speculative and remote and that there were "other parties better positioned to raise [the] claims." Robinson Twp., 83 A.3d at 921. In response, the citizens generally argued that they had standing because Marcellus Shale drilling directly impacted them and that Act 13's regulatory scheme violated, *inter alia*, the ERA. Id. at 915-16. The Court agreed with the citizens and concluded:

> In response to preliminary objections, the citizens relied on of-record affidavits to show that individual members of the [non-profit organization] are Pennsylvania residents and/or owners of property and business interests in municipalities and zoning districts that either already host or **are likely to host** active natural gas operations related to the Marcellus Shale Formation. Like [two other individual landowners] (as to whom the Commonwealth conceded the standing issue), these members asserted that they **are likely to suffer considerable harm** with respect to the values of their existing homes and the enjoyment of their properties given the intrusion of industrial uses and the change in the character of their zoning districts effected by Act 13. **These individual members have a substantial and direct interest in the outcome of the litigation premised upon the serious risk of alteration in the physical nature of their respective political subdivisions and the components of their surrounding environment. This interest is not remote.**

Id. at 922 (emphasis added) (record citations omitted).

Here, Petitioner McIntyre alleges that she is 10 years old, lives in Philadelphia, and attends fourth grade at Germantown Friends School. (Petition ¶ 9.) She suffers from asthma and a pollen allergy and is concerned about how climate change will impact her conditions. (Id.) Ms. McIntyre also alleges that

25

rising sea levels associated with climate change threaten to inundate her home town of Philadelphia with floodwaters, and that rising temperatures are associated with a reduction in snow that will limit her ability to go skiing in the Pocono Mountains and other locations. (Id.) In addition to concern over the future impacts of climate change, Ms. McIntyre alleges that climate change is impacting her life and environment now in the following ways: "[t]he increasingly hot summer temperatures have ma[d]e it hard for [her] to enjoy outdoor activities, such as riding bikes, hiking, and playing soccer"; she likes to hike but her enjoyment of the forests is reduced by the prevalence of dangerous ticks and the disruption of wildlife caused by climate change; and the increasing frequency and destructiveness of storms poses an immediate threat to her safety, well-being, and ability to use and enjoy her property. (Id. at ¶¶ 9-10) Ms. McIntyre cites to examples where she has allegedly been threatened by extreme weather events caused by climate change: first, she has "experienced tornadoes where she lives, which are not normal and have been linked to climate change," and second, she was involved in an incident during Hurricane Sandy in October of 2012 where she and her mother "got stuck in floodwaters when a stream by her house overflowed its banks." (Id. at ¶ 10.)

Further, Ms. McIntyre alleges that she, and the other minor Petitioners,

> represent the youngest living generation of Pennsylvania's public trust beneficiaries, and have a substantial, direct, and immediate interest in protecting the environment, their quality of life, and in ensuring that the climate remains stable enough to secure their constitutional rights to a livable future. A livable future includes the opportunity to drink clean water, to grow food that will abate hunger, to be free from direct and imminent property damage caused by extreme weather events, to be able to enjoy and benefit from the use of property, and to enjoy the abundant and rich biodiversity in Pennsylvania. []Petitioners are

26

> suffering both immediate and threatened injuries as a result of actions and inactions by Respondents and will continue to suffer more injuries to their health, personal safety, bodily integrity, cultural and spiritual practices, economic stability, food security, property, and recreational interests without the relief sought here. The relief requested will redress the [] Petitioners' injuries by reducing the conditions from climate change that adversely affect the [] Petitioners.

(Id. at ¶ 23.)

Based on these allegations, which we must accept as true, Ms. McIntyre has sufficiently alleged facts conferring her standing to assert the claims in the Petition. First, as to whether her interest is substantial, Ms. McIntyre avers that climate change and Respondents' failure to act appropriately to combat the climate crisis has diminished her ability to engage in activities she enjoys, threatens her safety, and raised concern over whether her health and enjoyment of the environment will be negatively diminished in the future. (Id. at ¶¶ 9-10.) These allegations sound much like those asserted in Friends of the Earth and Robinson Township, which were found to be beyond the abstract interest of the general public in ensuring obedience with the law. While many people like to hike and are impacted by severe weather, Ms. McIntyre's allegations that her ability to enjoy outdoor activity is diminished and that she has been harmed by floods linked to climate change have sufficiently distinguished her "from those asserting only the common right of the entire public that the law be obeyed." Wm. Penn Parking, 346 A.2d at 287.

Respondents distinguish Robinson Township and similar cases upon which Petitioners rely by arguing that those cases involve appeals of actions – permit decisions or legislation enactments – that resulted in harm to those persons, and not, as here, the harm based on Respondents' alleged failure to act that is generic

27

and no different from the interests of the general public. Respondents are correct that, heretofore, we have not addressed a case where the alleged harm and violation of law is the government's failure to act. However, we see no reason to conclude that Ms. McIntyre's interest is less substantial than the interests of those in Robinson Township or Friends of the Earth solely because she is alleging harm caused by Respondents' failure to fulfill an allegedly mandatory duty instead of harm caused by an affirmative act. Instead of asserting a right to relief under the first provision of the ERA, Ms. McIntyre asserts a right to relief under the second provision of the ERA, which "places an affirmative duty on the Commonwealth to 'prevent and remedy the degradation, diminution, or depletion of our public natural resources.'" Pa. Envtl. Def. Found. 108 A.3d at 168 (quoting the ERA).

Next, as to whether Ms. McIntyre's interests are "direct," Respondents argue that Ms. McIntyre asserts generalized injuries that may or may not be directly related to climate change and that some of the injuries are associated with activities conducted outside of Pennsylvania. Respondents further argue that Ms. McIntyre has not connected these speculative impacts to any action by Respondents. However, Ms. McIntyre specifically alleges a causal connection by asserting that she is harmed by climate change and that Respondents have violated their duty to conserve and maintain the natural resources as required by the ERA. (Petition ¶¶ 90, 92.) Specifically, Ms. McIntyre alleges that "[b]ecause of Respondents' failures to carry out their mandatory duties under [the ERA], dangerous levels of $CO_2$ and GHGs are occurring which have unreasonably contributed to the actual degradation of the air, water, and natural, historic, and esthetic values of the environment." (Id. at ¶ 92.) Ms. McIntyre has thus alleged a causal connection between the harm alleged and the alleged inaction of Respondents.

28

Finally, as to whether Ms. McIntyre's interests are "immediate," Respondents contend that the remote and speculative nature of Ms. McIntyre's claims are illustrated by Petitioners' factual allegations. PUC Respondents point to the numerous portions of the Petition discussing the "expected" impacts of climate change, and allegations that due to these impacts, Petitioners "could" be harmed. Ms. McIntyre alleges that she and the other Petitioners are suffering harm based on the threat of climate change now, and the fact that many of the deleterious effects of climate change will allegedly occur in the coming decades does not render their interests remote. Like the petitioners in Robinson Township, whom the Supreme Court concluded had immediate interests in the litigation based on allegations of **likely harms**, Ms. McIntyre alleges both present and likely future harms. We have said that "[a]n immediate interest is shown 'where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or the constitutional guarantee in question.'" Unified Sportsmen of Pa. ex rel. Their Members v. Pa. Game Comm'n, 903 A.2d 117, 123 (Pa. Cmwlth. 2006) (quoting George v. Pa. Pub. Util. Comm'n, 735 A.2d 1282, 1286 (Pa. Cmwlth. 1999)). The zone of interest protected by the ERA is the rights of all the people of the Commonwealth, **including future generations**. Pa. Envtl. Def. Found. 108 A.3d at 157. The interests asserted here – the right to enjoy public natural resources and to not be harmed by the effects of environmental degradation now and in the future – are among the interests protected by the ERA. For these reasons, Ms. McIntyre has standing, and we therefore overrule Respondents' POs alleging that Petitioners lack standing. (Exec. Branch POs ¶¶ 129-38; PUC POs ¶¶ 35-46.)[12]

---

[12] The remaining Petitioners assert identical causes of actions as Ms. McIntyre. Because we conclude that Ms. McIntyre has standing, we need not address whether the other Petitioners

*(Continued…)*

## C. Mandamus

Mandamus is an extraordinary remedy "designed to compel the performance of a ministerial act or mandatory duty, as opposed to a discretionary act." Unified Sportsmen, 903 A.2d at 125. Mandamus cannot be used to direct the exercise of judgment or discretion in any particular way. Clark v. Beard, 918 A.2d 155, 159 (Pa. Cmwlth. 2007). Nor will it issue to establish legal rights. Id. "We may issue a writ of mandamus only where the petitioner has a clear legal right to enforce the performance of a ministerial act or mandatory duty, the defendant has a corresponding duty to perform the act[,] and the petitioner has no other adequate or appropriate remedy." Unified Sportsmen, 903 A.2d at 125.

Petitioners argue that the ERA imposes certain mandatory duties, including the duty "to prevent and remedy the degradation, diminution, or depletion of our public natural resources." (Petitioners' Br. at 18 (quoting Robinson Twp, 83 A.3d at 957).) It is long established that the ERA charges the Commonwealth "with the duty of conserving and maintaining [public natural resources] for the benefit of the people." Snelling v. Dep't of Transp., 366 A.2d 1298, 1305 (Pa. 1976). The question posed, however, is not whether the ERA imposes mandatory duties in the general sense, but whether the ERA provides Petitioners with a clear right to the performance of the **specific acts** for which Petitioners requests a writ, and whether the performance of such acts by Respondents is mandatory in nature.

We addressed the mandatory duties imposed upon executive branch agencies and officials in Community College of Delaware County and National Solid

---

also have standing to reach the merits of this case. See Callowhill Neighborhood Ass'n v. City of Philadelphia Zoning Bd. of Adjustment, 118 A.3d 1214, 1220-21 (Pa. Cmwlth.), appeal denied, 129 A.3d 1244 (Pa. 2015) (concluding that because one objector in a zoning appeal raised all the arguments at issue below and has standing, the Court need not address whether the other objectors also have standing).

Wastes Management Association. <u>Delaware County</u> involved an appeal of the EHB's decision to reverse the grant of a sewage permit issued by the Department of Environmental Resources (DER).[13] The EHB concluded in that case that DER did not adequately consider the environmental impact of the proposed sewage lines in light of the requirements of the ERA. <u>Cmty. Coll. of Delaware Cnty.</u>, 342 A.2d at 474. According to the EHB, prior to issuing the permit, DER was required to assess the long-range and indirect impact of the sewer project on the values expressed in the ERA, consider alternative methods of using the resources in question, and consider alternative methods of attaining the objectives sought by the permit. <u>Id.</u> Upon review, we evaluated the mandates of the Clean Streams Law,[14] the law governing DER's permit process. <u>Id.</u> at 477-78. Finding no requirement in the Clean Stream Law to conduct the analysis proscribed by the EHB, we held that by requiring DER to examine issues outside those required by the Clean Streams Law, the EHB imposed requirements that extended beyond what was intended by the General Assembly. <u>Id.</u> at 480. While we noted that the ERA "may impose an obligation upon the Commonwealth to consider the propriety of preserving land as open space, **it cannot legally operate to expand the powers of a statutory agency** . . . ." <u>Id.</u> at 482 (emphasis added). We held that the ERA "could operate **only to limit such powers as had been expressly delegated by proper enabling legislation.**" <u>Id.</u> (emphasis added).

This Court applied the above holding to an executive action in which the Governor issued Executive Order 1989–8 governing municipal waste disposal

---

[13] DER was renamed as the Department of Environmental Protection (DEP) on July 1, 1995 pursuant to the Section 501 of the Conservation and Natural Resources Act, Act of June 28, 1995, P.L 89, 71 P.S. § 1340.501.

[14] Act of June 22, 1937, <u>as amended</u>, 35 P.S. §§ 691.1 – 691.1001.

throughout the Commonwealth. The executive order effectively ordered DER to stop reviewing applications or issuing permits for new landfills until DER developed and adopted a state-wide Municipal Waste Management Plan. Nat'l Solid Wastes Mgmt. Ass'n., 600 A.2d at 261. The executive order further "set[] a standard for determining maximum and average waste volume limits for existing landfills." Id. at 264. Relevant to the instant matter, the Commonwealth argued that the Governor had the authority to issue Executive Order 1989–8 pursuant to the Governor's obligations under the ERA. Id. at 265. An association of waste management providers sought declaratory relief stating that the executive orders contravened statutes and associated regulations governing solid waste management, which, the association argued, formed a comprehensive scheme for the regulation of municipal waste landfills. Id. at 262. We agreed with the association. According to the Court:

> Our review of [municipal waste statutes] and the regulations promulgated pursuant thereto, indicate the General Assembly's clear intent to regulate in plenary fashion every aspect of the [disposal of solid waste]. Executive Order 1989–8 clearly conflicts with those acts and regulations, none of which provide the Governor with the authority to have issued such an executive order. . . . Additionally, we find no authority for Executive Order 1989–8 in [the ERA]. **The balancing of environmental and societal concerns, which the Commonwealth argues is mandated by [the ERA], was achieved through the legislative process which enacted Acts 97 and 101 and which promulgated the applicable regulations. [The ERA] does not give the Governor the authority to disturb that legislative scheme. Neither does it give him the authority to alter DER's responsibilities pursuant to that scheme.**

Id. at 265 (emphasis added) (quotations and citations omitted).

Because the ERA does not authorize Respondents to disturb the legislative scheme, we must assess whether the actions requested are otherwise made

mandatory by the climate change legislative scheme. While the General Assembly has enacted a variety of provisions that directly and indirectly impact global climate change, the current climate change legislative scheme is primarily comprised of the Pennsylvania Climate Change Act (CCA),[15] and the Air Pollution Control Act (APCA).[16] Respondents acknowledge that they have mandatory duties pursuant to Sections 3(c) and 7(a) of the CCA, 71 P.S. §§ 1361.3(c), 1361.7(a), to examine the potential impacts of climate change and to submit a report and an action plan to the Governor every three years. (Exec. Branch POs ¶¶ 17-18, 148.) Respondents further acknowledge that the General Assembly, through the APCA, bestowed upon them a duty to promulgate and implement rules and regulations to reduce $CO_2$ and GHG emissions.[17] (Id. at ¶ 149.) Respondents argue that the legislative scheme does not require them to combat climate change through the steps outlined in Petitioners' request for a writ of mandamus.

---

[15] Act of July 9, 2008, P.L. 935, 71 P.S. §§ 1361.1 – 1361.8.

[16] Act of January 8, 1960, P.L. 2119, as amended, 35 P.S. §§ 4001 – 4015.

[17] Respondents' duties to this end derive, in part, from Section 5(a)(8) of the APCA, 35 P.S. § 4004(1), which requires the EQB to adopt rules and regulations to implement the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q. The United States Supreme Court, in Massachusetts v. Environmental Protection Agency, 549 U.S. at 528-29, had "little trouble" concluding that GHGs are "air pollutants" as defined by the Act and that the Environmental Protection Agency may regulate GHGs. According to the Court:

> The Clean Air Act's sweeping definition of "air pollutant" includes "*any* air pollution agent or combination of such agents, including *any* physical, chemical ... substance or matter which is emitted into or otherwise enters the ambient air ... ." § 7602(g) (emphasis added). On its face, the definition embraces all airborne compounds of whatever stripe, and underscores that intent through the repeated use of the word "any." Carbon dioxide, methane, nitrous oxide, and hydrofluorocarbons are without a doubt "physical [and] chemical ... substance [s] which [are] emitted into ... the ambient air." The statute is unambiguous.

Id. (quoting the Clean Air Act, 42 U.S.C. § 7602(g)) (emphasis in original).

33

Petitioners point to no legislative enactments or regulatory provisions, and we have found none, that mandate Respondents to do any of the actions sought in the writ. Under the current scheme, deciding whether to conduct particular studies, promulgate regulations or issue executive orders detailing the process by which environmental decisions are made, and to prepare and implement comprehensive regulations addressing climate change are either discretionary acts of government officials or is a task for the General Assembly.[18] Thus, we conclude that because Petitioners do not have a clear right to have Respondents conduct the requested studies, promulgate or implement the requested regulations, or issue the requested executive orders, mandamus will not lie and we sustain Respondents' POs to that end. (Exec. Branch POs ¶¶ 100-09; PUC POs ¶¶ 47-60.)

## D.    Declaratory Relief

Petitioners' remaining requests seek declaratory relief pursuant to the Declaratory Judgments Act, 42 Pa. C.S. §§ 7531 – 7541.

> [T]he purpose of the Declaratory Judgment[s] Act . . . is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered," the availability of declaratory relief is limited by certain justiciability concerns. In order to sustain an action under the Declaratory Judgment[s] Act, a plaintiff must allege an interest which is direct, substantial and immediate, and must demonstrate the existence of a real or actual controversy, as the courts of this Commonwealth are generally proscribed from rendering decisions in the abstract or issuing purely advisory opinions.

---

[18] We note that DEP conducted a thorough analysis of the activities it and other agencies are currently conducting pursuant to various statutory and regulatory requirements in response to Petitioner Funk's September 5, 2013 Rulemaking Petition that is attached to the Executive Branch Respondents' POs. (Exec. Branch POs, App. 2.)

Office of Governor v. Donahue, 98 A.3d 1223, 1229 (Pa. 2014) (citation omitted). "Granting or denying an action for a declaratory judgment is committed to the sound discretion of a court of original jurisdiction." Pa. Envtl. Def. Found., 108 A.3d at 154.

Petitioners request this Court to declare that: (1) the right to safe levels of $CO_2$ and other GHGs in the atmosphere is protected by the ERA and that Respondents have a duty to not act contrary to, and protect, that right; and (2) Respondents have failed to meet these obligations. (Declaratory Relief Requests ¶¶ 1-6.) Granting Petitioners' declaratory relief on these questions is not appropriate under the Declaratory Judgments Act because doing so would require us to enter an advisory opinion. "[D]eclaratory judgment must not be employed . . . as a medium for the rendition of an advisory opinion which may prove to be purely academic." Gulnac by Gulnac v. S. Butler Cnty. Sch. Dist., 587 A.2d 699, 701 (Pa. 1991). "Courts generally should refuse to grant requests for declaratory judgment where it would not resolve the controversy or uncertainty which spurred the request." Rendell v. Pa. State Ethics Comm'n., 938 A.2d 554, 559 (Pa. Cmwlth. 2007).

Petitioners' request that we declare that an atmosphere with safe levels of $CO_2$ and other GHGs is protected by the ERA, that Respondents have a duty to protect the atmosphere through both not acting contrary to that right and by affirmatively protecting the atmosphere, and that Respondents have failed to uphold their obligations under the ERA "would provide a legal predicate to the success of [their mandamus] claims[,] but would otherwise have no independent significance." Stackhouse, 892 A.2d at 63. We have already determined that

35

mandamus will not lie because Respondents do not have a mandatory duty to conduct the requested studies, promulgate or implement the requested regulation, or issue the requested executive orders. As there is also no indication that future litigation between the parties will turn on the questions raised by Petitioners' requests for declaratory relief, we decline to grant declaratory relief and sustain Respondents' POs alleging that declaratory relief in this context would have no practical effect. (Exec. Branch POs ¶¶ 68, 156-57; PUC POs ¶¶ 124-27.)

## V. CONCLUSION

For the foregoing reasons, we sustain, in part, Respondents' POs alleging that the mandamus will not lie because Petitioners lack a clear right to performance of requested activities, and that declaratory relief would serve no practical purpose, and dismiss the Petition for Review with prejudice. We also conclude that granting Petitioners leave to amend their Petition for a third time would be futile given our legal conclusions herein.[19]

_____
**RENÉE COHN JUBELIRER,** Judge

Senior Judge Colins concurs in the result only.

---

[19] Because all claims have been dismissed, we need not address Respondents' remaining POs. Further, because we did not consider any of the information attached to Respondents' POs, we will not address Petitioners' argument in their brief that the POs constitute speaking demurrers.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ashley Funk; Otis Harrison, a minor,    :
by his guardian Amy Lee; Lilian    :
McIntyre, a minor, by her guardian    :
Jennifer McIntyre; Rekha    :
Dhillon-Richardson, a minor, by her    :
guardian Jaskiran Dhillon; Austin    :
Fortino, a minor, by his guardian Ruth    :
Fortino; Darius Abrams, a minor, by    :
his guardian Elaine Abrams; Kaia    :
Luna Elinich, a minor, by her guardian    :
Arianne Elinich,    :
                          Petitioners    :
   :
             v.    :   No. 467 M.D. 2015
   :
Tom Wolf, in his official capacity as    :
Governor of Pennsylvania;    :
Pennsylvania Department of    :
Environmental Protection; John    :
Quigley, in his official capacity as    :
Secretary of the Pennsylvania    :
Department of Environmental    :
Protection; Pennsylvania Environmental :
Quality Board; John Quigley, in his    :
official capacity as Chairperson of the    :
Environmental Quality Board;    :
Pennsylvania Public Utility    :
Commission; Gladys M. Brown, in    :
her official capacity as Chairperson of    :
the Public Utility Commission;    :
Pennsylvania Department of    :
Conservation and Natural Resources;    :
Cindy Adams Dunn, in her official    :
capacity as Secretary of the    :
Pennsylvania Department of    :
Conservation and Natural Resources;    :
Pennsylvania Department of    :
Transportation; Leslie S. Richards, in    :
her official capacity as Secretary of the    :
Pennsylvania Department of    :

Transportation; Pennsylvania : 
Department of Agriculture; Russell C. : 
Redding, in his official capacity as : 
Secretary of the Department of : 
Agriculture, : 
                              Respondents :

# **O R D E R**

**NOW**, July 26, 2016, the Preliminary Objections (POs) of Respondents to the Second Amended Petition for Review Seeking Declaratory and Mandamus Relief in the above-captioned matter are **OVERRULED**, in part, and **SUSTAINED**, in part, as follows:

(1) Respondents' PO alleging that this Court lacks subject matter jurisdiction is **OVERRULED**;

(2) Respondents' POs alleging that Ashley Funk, et al. (Petitioners) lack standing to assert the claims in the Petition for Review are **OVERRULED**;

(3) Respondents' POs alleging that mandamus will not lie are **SUSTAINED**;

(4) Respondents' POs alleging that declaratory relief would amount to an advisory opinion are **SUSTAINED**.

The Second Amended Petition for Review Seeking Declaratory and Mandamus Relief filed by Petitioners is dismissed with prejudice.

_____
**RENÉE COHN JUBELIRER,** Judge