# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Delaware Riverkeeper Network, : 
and the Delaware Riverkeeper, : 
Maya van Rossum, : 
                 Petitioners : 
                 : 
         v. : No. 285 M.D. 2019
                 : Argued: September 15, 2020
Pennsylvania Department of : 
Environmental Protection of the : 
Commonwealth of Pennsylvania and : 
Environmental Quality Board of the : 
Commonwealth of Pennsylvania, : 
                 Respondents : 

BEFORE: HONORABLE P. KEVIN BROBSON, Judge[1]
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**            **FILED: January 12, 2021**

Before the Court in our original jurisdiction are the amended preliminary objections of the Pennsylvania Department of Environmental Protection (DEP) and the Environmental Quality Board (EQB) (collectively, the Agencies[2]) to an amended

---

[1] This case was assigned to the opinion writer prior to January 4, 2021, when Judge Brobson became President Judge.

[2] In *Arsenal Coal Co. v. Department of Environmental Resources*, 477 A.2d 1333 (Pa. 1984), the Pennsylvania Supreme Court explained:

**(Footnote continued on next page…)**

petition for review (Petition) filed by the Delaware Riverkeeper Network (DRN) and Maya van Rossum, who is the Delaware Riverkeeper and executive director of DRN, (collectively, Riverkeeper). Riverkeeper filed the Petition in the nature of a mandamus action, seeking declaratory and injunctive relief to compel DEP to respond to a petition for rulemaking that Riverkeeper submitted to the Agencies (Rulemaking Petition). For the reasons set forth below, we sustain, in part, and overrule, in part, the Agencies' preliminary objections.

## I. BACKGROUND

In ruling on preliminary objections, we accept as true all well-pleaded material allegations in the Petition and any reasonable inferences that we may draw from the averments. *Meier v. Maleski*, 648 A.2d 595, 600 (Pa. Cmwlth. 1994). The Court, however, is not bound by legal conclusions, unwarranted inferences from facts, argumentative allegations, or expressions of opinion encompassed in the complaint. *Id.* We may sustain preliminary objections only when the law makes clear that the petitioner cannot succeed on the claim, and we must resolve any doubt in favor of the petitioner. *Id.* "We review preliminary objections in the nature of a demurrer under the above guidelines and may sustain a demurrer only when a petitioner has failed to state a claim for which relief may be granted." *Armstrong Cnty. Mem'l Hosp. v. Dep't of Pub. Welfare*, 67 A.3d 160, 170 (Pa. Cmwlth. 2013).

> The environmental law of this Commonwealth is administratively regulated by three separate bodies. The [EQB] has as its primary purpose and power to formulate, adopt and promulgate rules and regulations which become the rules and regulations of the Department of Environmental Resources [(now DEP)], which then has the duty of enforcing the regulations. The third body, the Environmental Hearing Board [(EHB),] is empowered to review orders, permits, licenses and decisions of [DEP] in its enforcement role.

*Arsenal Coal*, 477 A.2d at 1336 n.3 (citation omitted).

2

With the above standard in mind, we accept as true the following allegations of the Petition. DRN is a nonprofit organization with approximately 20,000 members that undertakes, *inter alia*, environmental advocacy to protect and restore the Delaware River and its tributaries, habitats, and resources. (Pet. ¶ 10.) On behalf of DRN and its members, Riverkeeper has petitioned the Agencies for regulatory action—and has instituted this action—with respect to contamination of water with the chemical perfluorooctanoic acid (PFOA). (*Id.* ¶¶ 2, 12.)

PFOA is part of a family of chemical compounds known as per- and polyfluoroalkyl substances (PFAS). (*Id.* ¶ 2.) These man-made chemicals were manufactured from the 1950s until recently and are used in various industrial applications and as an ingredient in aqueous firefighting foam. (*Id.* ¶ 3.) PFAS, once released, may contaminate surface water, groundwater, and other parts of the natural environment, and they resist biodegradation. (*Id.*) They are also toxic to humans, animal life, and ecosystems generally. (*Id.* ¶¶ 4, 21.) When ingested, PFAS persist in the body for many years, causing, *inter alia*, diseases of the liver, thyroid, and pancreas. (*Id.* ¶ 4.) Exposure in humans—even at very low levels—is linked to a host of diseases, such as cancers, high cholesterol, complications of pregnancy, and immune-system disorders. (*Id.* ¶¶ 3, 27, 39-40.) Infants, children, and individuals with compromised immune systems are particularly vulnerable to the adverse health effects of PFAS, which include decreased effectiveness of childhood vaccines. (*Id.* ¶¶ 4, 37-38.) No medical procedure exists to remove PFAS from the body once they are ingested. (*Id.* ¶ 41.)

Some members of DRN live in Bucks and Montgomery Counties, Pennsylvania, where DEP is currently investigating water supplies that are contaminated with significantly elevated levels of PFAS. (*Id.* ¶¶ 5, 11, 32.)

3

Water from one municipal well in Warminster, Pennsylvania, contained 1,440 parts per trillion (ppt) of PFOA, whereas a safe concentration for drinking water might be between 1 ppt and 6 ppt. (*Id.* ¶ 5.) Much of the worst contamination is located near sites where PFAS-based firefighting foam was used, including former and current military air stations in the area of the Delaware River. (*Id.* ¶¶ 11, 28, 32.) Members of DRN—and, by implication, members of the public—have been and continue to be adversely affected by drinking water contaminated by PFAS, which they often ingest without knowledge of the contamination. (*Id.* ¶ 6.) Beginning in 2014, numerous public and private wells in Bucks and Montgomery Counties were closed due to high PFOA levels but not before many people consumed the contaminated water. (*Id.* ¶ 30.)

DRN first became aware of PFAS contamination in Pennsylvania in 2005 and has advocated for regulation of PFAS in drinking water since that time in both New Jersey and Pennsylvania. (*Id.* ¶¶ 13-14.) In 2012, the United States Environmental Protection Agency (EPA) added PFOA to an unregulated contaminants rule, requiring water providers to monitor PFOA levels. (*Id.* ¶ 31.) EPA initially set a nonbinding health advisory level for PFOA at 400 ppt, but, in 2016, EPA revised the advisory level downward to 70 ppt. (*Id.* ¶¶ 35-36.) Many public and private water supplies in Pennsylvania far exceed that level of contamination. (*Id.* ¶ 31.) Scientific studies—including assessments by the federal Agency for Toxic Substance and Disease Registry—have concluded that the current advisory level of 70 ppt is inadequate to protect human health and that safe levels are significantly lower. (*Id.* ¶ 37.) In August 2018, the New Jersey Drinking Water Quality Institute voted to set binding maximum contaminant levels (MCL) for PFAS generally at 13 ppt and for PFOA at 14 ppt. (*Id.* ¶ 49.) Those MCLs were based on

4

safe levels of exposure for adults, but they may not adequately protect children, who are more sensitive to lower levels of exposure. (*Id.* ¶¶ 49-55.) EPA has not yet established a binding federal limit on PFAS concentrations. (*Id.* ¶ 42.)

On May 8, 2017, DRN submitted the Rulemaking Petition, requesting that the Agencies exercise their authority under the Pennsylvania Safe Drinking Water Act (Act)[3] to establish an MCL of between 1 ppt and 6 ppt for PFOA in drinking water. (*Id.* ¶ 55.) In accordance with regulations governing the Agencies' response to petitions for establishing an MCL,[4] DRN was permitted to present the Rulemaking Petition at the next meeting of the EQB, which was held on August 15, 2017. (*Id.* ¶ 61.) At the meeting, DEP officials recommended that the Rulemaking Petition be accepted for further evaluation and represented that DEP would produce and present a report on the Rulemaking Petition no later than June 2018. (*Id.* ¶ 62.) The EQB voted unanimously to accept the Rulemaking Petition for review. (*Id.* ¶ 63.)

Despite DEP's representation, it did not produce a report on the Rulemaking Petition in June 2018, and it still has not done so. (*Id.* ¶ 65.) On June 1, 2018, counsel for DRN contacted Patrick McDonnell, who serves as DEP Secretary and Chair of the EQB, in writing to request action on the Rulemaking Petition. (*Id.* ¶ 66.) The Agencies did not respond directly to DRN's letter. (*Id.* ¶ 67.) At the June 19, 2018 meeting of the EQB, DEP represented that it would need an undefined amount of additional time to respond to the Rulemaking Petition and that it was then attempting to hire a toxicologist to assist with production of the report. (*Id.* ¶ 68.) On September 19, 2018, Pennsylvania Governor Tom Wolf announced the creation

---

[3] Act of May 1, 1984, P.L. 206, *as amended*, 35 P.S. §§ 721.1-.17.

[4] *See* 25 Pa. Code §§ 23.1-.8.

5

of a PFOA action team and that he would prioritize hiring toxicologists to establish drinking water limits for PFOA. (*Id.* ¶¶ 75-76.) On May 3, 2019, Secretary McDonnell suggested to the press that DEP would complete an MCL proposal for PFOA within three years. (*Id.* ¶ 86.) At another meeting of the EQB on June 11, 2019, the Rulemaking Petition appeared on the agenda but was not discussed during the public portion of the meeting, and DRN representatives present at the meeting were not permitted to address the EQB. (*Id.* ¶¶ 69-70.) The Agencies have pursued no regulation of PFAS in drinking water below the EPA health advisory level of 70 ppt—which is not a safe drinking water level—and, for unknown reasons, have required further testing of wells with a concentration of at least 40 ppt of PFAS. (*Id.* ¶¶ 73-74, 85.) Nor have the Agencies acted on or responded to the Rulemaking Petition in any way, despite DEP possessing sufficient information to establish an MCL for PFOA, even if only on an interim basis. (*Id.* ¶¶ 83, 92.)

On July 11, 2019, Riverkeeper filed the Petition, which consists of three counts. In Count I, Riverkeeper brings a claim under the citizen suit provision in Section 13(b) of the Act, 35 P.S. § 721.13(b), for injunctive relief requiring DEP to produce a report evaluating and responding to the Rulemaking Petition. (*Id.* ¶¶ 106, 109.) Riverkeeper avers that, in failing to issue such a report, DEP has breached its mandatory duty under Section 5 of the Act, 35 P.S. § 721.5, to adopt and implement a public water supply program, including through establishing MCLs. (*Id.* ¶¶ 98-100, 105.) Additionally, Riverkeeper cites EQB regulations governing the Agencies' responses to petitions for rulemaking (EQB policy), which, Riverkeeper contends, require DEP to produce the requested report within a certain, defined timeframe. (*Id.* ¶¶ 101-03, 106 (citing 25 Pa. Code § 23.6).) Riverkeeper

6

claims that DEP's persistent inaction in response to the Rulemaking Petition amounts to DEP's failure to perform a nondiscretionary act required by the Act, with that failure to act forming the basis of Riverkeeper's citizen suit under Section 13(b) of the Act.

In Count II, Riverkeeper alleges that Article I, Section 27 of the Pennsylvania Constitution, known as the Environmental Rights Amendment, imposes an affirmative fiduciary duty on DEP to preserve, *inter alia*, safe drinking water within the Commonwealth.  (*Id.* ¶¶ 111-14 (citing *Pa. Env't Def. Found. v. Cmwlth.*, 161 A.3d 911 (Pa. 2017); *Robinson Twp. v. Cmwlth.*, 83 A.3d 901 (Pa. 2013)).) Riverkeeper contends that DEP has breached that duty by failing to respond to the Rulemaking Petition or otherwise propose an MCL for PFOAs, and Riverkeeper essentially seeks an injunction requiring DEP to evaluate the Rulemaking Petition and/or propose an MCL in response.  (*Id.* ¶¶ 115-17.)

In Count III, Riverkeeper seeks a declaration that DEP, by its inaction, is violating its duty to respond to the Rulemaking Petition, which duty, in Riverkeeper's view, is found in the Act and the Environmental Rights Amendment. (*Id.* ¶¶ 119-21.)  Riverkeeper also seeks payment of its attorney's fees and costs. (*Id.* ¶ 121.)

## II. ISSUES

The Agencies responded to the Petition by filing preliminary objections in the nature of a demurrer.  With respect to Count I of the Petition, the Agencies assert that the Act does not impose a nondiscretionary duty on them to produce the report Riverkeeper seeks, to adopt an MCL for any specific contaminant, or to perform any other duty alleged by Riverkeeper; thus, the Act cannot serve as a legal basis for Riverkeeper's claim.  The Agencies also claim that the EQB policy is not binding

7

on the Agencies and, even if it was binding, cannot give rise to a cause of action under the Act. With respect to Count II, the Agencies insist that they are complying with their duties under the Environmental Rights Amendment because they are currently undertaking a scientific evaluation of the Rulemaking Petition. They claim that setting a specific deadline for agency action would hinder their proper discharge of those duties and be inconsistent with their constitutional obligations. With respect to Count III, the Agencies first assert that Riverkeeper's request for attorney's fees and costs is insufficiently specific, and they ask this Court to direct Riverkeeper to replead Count III with greater specificity as to that request. They also demur to Count III, arguing that Riverkeeper is not entitled to declaratory relief based on the Agencies' arguments as to Counts I and II and that Riverkeeper has articulated no basis for its request for attorney's fees and costs.

In addition to their demurrer to each individual count of the Petition, the Agencies demur to all counts as to the EQB in particular. They argue that the EQB is not a necessary and indispensable party to this action, because Riverkeeper demands no action from the EQB and essentially admits in the Petition that it makes no allegations directly against the EQB.

### III. DISCUSSION

### A. The Act (Count I)

DEP first argues that Riverkeeper has failed to state a claim under the citizen suit provision found in Section 13(b)(1) of the Act, which provides:

> (b) **Civil action to compel compliance.**--Any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit *issued pursuant to this act*:
>
>> (1) against [DEP] where there is alleged a failure of [DEP] to perform any act *which is not discretionary with [DEP]*.

8

(Emphasis added.) Also relevant to our analysis are Sections 4(a), 5(a), and 5(b) of the Act, 35 P.S. §§ 721.4(a), 721.5(a)-(b). Section 4(a) of the Act provides, in relevant part:

> (a) **[EQB] to establish standards, rules and regulations.**--The [EQB] . . . shall . . . adopt such rules and regulations of [DEP], governing the provision of drinking water to the public, as it deems necessary for the implementation of the provisions of this act. The [EQB] *shall* adopt [MCLs] and treatment technique requirements no less stringent than those promulgated under the [the federal Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j-27 (FSDWA)], for all contaminants regulated under the national primary and secondary drinking water regulations. The [EQB] *may* adopt maximum contaminant levels or treatment technique requirements for any contaminant that a maximum contaminant level or treatment technique requirement has not been promulgated under the national primary and secondary drinking water regulations.

(Emphasis added.) Section 5(a)-(b) of the Act provides, in relevant part:

> (a) **State to assume primary enforcement.--**[DEP] shall adopt and implement a public water supply program which includes, but is not limited to, those program elements necessary to assume State primary enforcement responsibility under the [FSDWA]. The public water supply program shall include, but not be limited to, [MCLs] or treatment technique requirements establishing drinking water quality standards . . . .
>
> (b) **[DEP] to establish compliance procedures.--**[DEP] shall develop and implement procedures as may be necessary and appropriate in order to obtain compliance with this act or the rules and regulations promulgated, or permits issued hereunder.

Furthermore, the EQB's regulations governing responses to petitions for rulemaking provide, in relevant part:

> If the EQB accepts [a petition for rulemaking], a notice of acceptance will be published in the Pennsylvania Bulletin within 30 days. In addition, a report will be prepared in accordance with one of the following procedures:
>
> > (1) *Petitions other than stream redesignation petitions.* [DEP] will prepare a report evaluating the petition within 60 days. If the report cannot be completed within the 60-day period,

9

> at the next EQB meeting [DEP] will state how much additional time is necessary to complete the report. [DEP's] report will include a recommendation on whether the EQB should approve the action requested in the petition. If the recommendation is to change a regulation, the report will also specify the anticipated date that the EQB will consider a proposed rulemaking.

25 Pa. Code § 23.6.

In support of their argument that Riverkeeper has failed to state a claim under Section 13(b) of the Act, the Agencies first argue that nothing in the Act imposes a nondiscretionary duty on DEP to produce a report in response to the Rulemaking Petition. They note that Section 5(a) of the Act generally imposes a nondiscretionary duty to "adopt and implement a public water supply program," including, *inter alia*, MCLs, but they argue that the Agencies fulfilled that duty long ago when EPA found DEP's water supply program adequate, such that DEP could assume primary enforcement responsibility under the FSDWA. The Agencies emphasize that Section 5 of the Act does not affirmatively require the adoption of an MCL for any particular pollutant. In support of this argument, the Agencies emphasize that Section 4(a) of the Act, which affirmatively requires the EQB (not DEP) to establish MCLs for some pollutants, clearly makes establishing an MCL for PFAS discretionary with the EQB, because no federal MCL exists for PFAS.

Second, the Agencies focus on DEP's duty to "develop and implement procedures" for obtaining compliance with the Act, which is located in Section 5(b) of the Act. The Agencies claim that Riverkeeper has not shown how issuance of the DEP report is a procedure necessary to obtain compliance with the Act, and they essentially argue that issuance of that report is merely discretionary under the Act. In support, they note that the statutory provision authorizing submission of the Rulemaking Petition—Section 1920-A(h) of The Administrative

10

Code of 1929,[5] 71 P.S. § 510-20(h)—was enacted in 1980, before the Act. The Agencies argue that, because the General Assembly could have explicitly referenced the Section 1920-A(h) petition process as a ground for a citizen suit under Section 13(b) of the Act but did not do so, the General Assembly cannot have intended for agency inaction on a rulemaking petition to support a citizen suit under Section 13(b).

Finally, the Agencies argue that the EQB's regulation requiring a report on a certain timeline cannot support a cause of action under Section 13(b) of the Act, because (1) that regulation is a nonbinding statement of policy, not an enacted rule, and (2) even if the regulation was binding, it was not "issued pursuant to [the Act]," as is required for a regulation to form the basis of a Section 13(b) suit.

In response, Riverkeeper first concedes that DEP is not required by the Act, the EQB policy, or otherwise, to take any particular action requested in the Rulemaking Petition and that actually adopting an MCL for PFAS is, at this point, discretionary with the Agencies. Riverkeeper emphasizes, however, that in this litigation, it does not seek to require the Agencies to adopt an MCL, but rather it seeks to compel DEP to comply with the "statutory duty . . . to take *some* action" on the Rulemaking Petition. (Riverkeeper's Br. at 19 n.13 (emphasis added).) Riverkeeper identifies the nondiscretionary duty on which its claim is based as residing in Section 5 of the Act. It notes that the mandate that DEP "adopt and implement a public water supply program" is expressly and purposefully broad, such that it "includes, *but is not limited to*" compliance with federal requirements. Section 5(a) of the Act (emphasis added). Riverkeeper identifies similarly broad language throughout Section 5 of the Act, including such an expansion of DEP's

---

[5] Added by the Act of Dec. 3, 1970, P.L. 834.

11

duty in Section 5(b) of the Act to "develop and implement procedures" to effect compliance with the Act.

Based on these expansive descriptions of DEP's duties under the Act, Riverkeeper reasons that the EQB policy at issue is essentially the mechanism or procedure through which DEP discharges its duty to consider discretionary MCLs under the Act. Riverkeeper maintains that DEP's refusal to follow that procedure timely is a failure of its duty to implement a public water supply program and concludes that the Act imposes "a mandatory obligation on . . . DEP to engage in (at [the] very least) *the evaluation of* [the Rulemaking Petition] . . . or to take such other action to implement a public water supply that assures the provision of safe drinking water." (Riverkeeper's Br. at 26 (emphasis added).)

We agree with the Agencies. It is undisputed that, in order to proceed with a citizen suit under Section 13(b) of the Act, Riverkeeper must identify some nondiscretionary duty assigned to DEP under the Act and allege that DEP has breached that duty. Riverkeeper first relies on the duty enumerated in Section 5(a) of the Act, which requires DEP to "adopt and implement a public water supply program" that includes two components: (1) whatever elements are necessary for the Commonwealth to assume primary enforcement responsibility under the FSDWA, and (2) MCLs or treatment techniques for pollutants. Riverkeeper does not allege that DEP's inaction on the Rulemaking Petition endangers its primary enforcement role under the FSDWA but focuses on the second prong of DEP's duty—that DEP's public water supply program must include setting MCLs or treatment techniques. Riverkeeper also emphasizes Section 4(a) of the Act, which provides that the EQB (not DEP) "*shall* adopt" MCLs and/or treatment techniques no less stringent than those established under the FSDWA and that the EQB "*may*

12

adopt" MCLs and/or treatment techniques that are more stringent than those federal limits. 35 P.S. § 721.4(a) (emphasis added). In the relevant terminology, adoption of MCLs such as that proposed in the Rulemaking Petition is *discretionary* with the EQB, not nondiscretionary with DEP, as is required to support an action under Section 13(b) of the Act. In keeping with this analysis, Riverkeeper admits that adoption of the MCL it seeks is discretionary, not mandatory. (*See* Pet. ¶ 47 ("The [Act] provides that an MCL must be no less stringent than those promulgated under the [FSDWA,] but explicitly *permits* . . . DEP to establish additional and/or more stringent levels for . . . PFOA . . . ." (emphasis added)); Riverkeeper's Br. at 19 n.13 ("DEP has the *discretion* to issue an MCL in accordance with [Riverkeeper's] Rulemaking Petition . . . ." (emphasis added)).)

Nevertheless, Riverkeeper attempts to locate the requisite nondiscretionary duty within the Agencies' discretionary power to adopt MCLs under the Act, essentially arguing that this power somehow implies a nondiscretionary duty for DEP to evaluate and/or respond to petitions asking it to exercise its discretion. We find no such duty in the Act itself. As the Agencies point out, the Act does not mention rulemaking petitions or the EQB policy, let alone establish affirmative duties concerning them. (*See* Agencies' Br. at 24.) Nor does it require the Agencies to adhere to any particular rationale or timeframe in exercising the discretion afforded them under the Act to adopt—or not to adopt—MCLs more stringent than the federal MCLs.

Finally, we disagree with Riverkeeper's assertion that compliance with the EQB policy is somehow incorporated as a nondiscretionary duty within the Act. First, the EQB policy is not, as Riverkeeper argues, a procedure which DEP must adopt and implement pursuant to Section 5(b) of the Act. That section requires DEP

to implement procedures "as may be necessary and appropriate in order to obtain compliance with" the Act. But it also enumerates specific examples of the policies DEP must implement.[6] These examples obviously all relate to enforcement of existing laws or regulations against entities other than the Agencies, which is the purpose of Section 5(b) (*i.e.*, to "obtain compliance with" the Act). 35 P.S. § 721.5(b). We decline Riverkeeper's invitation to read Section 5(b) so broadly as to require DEP's compliance with a procedure that the General Assembly omitted from the lengthy list of examples it provided, and which is a procedure for regulatory change, not enforcement of existing regulations. Second, the EQB policy and the petition process generally are not "rules" or "regulations" promulgated *under the Act*—they are independent of the Act and preexisted it. Section 5(b), therefore, does not require DEP to implement procedures for enforcement of the EQB policy.

Simply put, DEP's consideration and adoption of the MCL Riverkeeper seeks are exercises of the discretion committed to the Agencies by the Act, and the Act

---

[6] These include:

(1) Monitoring and inspection.

(2) Maintaining an inventory of public water systems in the Commonwealth.

(3) A systematic program for conducting sanitary surveys of public water systems throughout the Commonwealth.

(4) The establishment and maintenance of a program for the certification of laboratories conducting analytical measurements of drinking water contaminants specified in the drinking water standards . . . .

(5) The establishment and maintenance of a permit program concerning plans and specifications for the design and construction of new or substantially modified public water systems . . . .

35 P.S. § 721.5(b).

does not impose any nondiscretionary duty on DEP in conjunction therewith.[7] The General Assembly was aware when it enacted the Act that Section 1920-A(h) of The Administrative Code of 1929 requires the Agencies to accept petitions for rulemaking. We have recognized that, pursuant to that provision, "private citizens may request that the EQB issue regulations by filing a petition for rulemaking with DEP." *Funk v. Dep't of Env't Prot.*, 71 A.3d 1097, 1099 (Pa. Cmwlth. 2013). The General Assembly did not, however, choose to include DEP's role in accepting or responding to petitions for rulemaking within the ambit of its nondiscretionary duties under the Act. "A court has no power to insert words into statutory provisions where the legislature has failed to supply them." *Amendola v. Civil Serv. Comm'n of Crafton Borough*, 589 A.2d 775, 777 (Pa. Cmwlth. 1991). Accordingly, we conclude that the Petition fails to allege any breach of a nondiscretionary duty under the Act by DEP. Accordingly, Riverkeeper has failed to set forth a cause of action under Section 13(b) of the Act.

## B. The Environmental Rights Amendment (Count II)

In support of their demurrer to Count II of the Petition, the Agencies first rely on their position with respect to Count I—that the Act does not impose a mandatory duty on the Agencies to pursue any specific regulatory action. Based on this position, the Agencies assert that Riverkeeper's Environmental Rights Amendment

---

[7] As Riverkeeper points out, the Petition is in the nature of a mandamus action. (*See* Riverkeeper's Br. at 29 n.19.) We acknowledge that mandamus is an appropriate remedy when an agency is "sitting on its hands" in the face of a *mandatory* duty, *Chanceford Aviation Props., L.L.P. v. Chanceford Township Board of Supervisors*, 923 A.2d 1099, 1108 (Pa. 2007), but we find no mandatory duty under the Act relevant to the allegations in the Petition. We also emphasize the extraordinary nature of mandamus relief, which can compel only an action that, unlike here, "involves no discretion on the part of" the agency. *Barndt v. Pa. Dep't of Corr.*, 902 A.2d 589, 592 (Pa. Cmwlth. 2006). Although we analyze Riverkeeper's Section 13(b) claim under the Act itself, and not on common law mandamus principles, we note that the result here is consistent with those principles, which would not support mandamus relief in this matter.

15

claim in this matter is legally insufficient, because the relevant statutory scheme—*i.e.*, the Act—cannot be displaced by general obligations under the amendment and the Act does not impose any mandatory duty supporting Riverkeeper's claims. (*See* Agencies' Br. at 29-30 (citing *Funk v. Wolf*, 144 A.3d 228 (Pa. Cmwlth. 2016) (*Funk*), *aff'd*, 158 A.3d 642 (Pa. 2017)).)

The Agencies also claim that the facts, as alleged in the Petition, demonstrate that they are acting consistently with their obligations under the Environmental Rights Amendment. In support, they cite DEP's initial announcement that a report would take more time, the creation of the PFAS action team, the hiring of toxicologists, and the implementation of a statewide sampling plan to gather data. The Agencies appear to dispute the factual allegation that they already possess sufficient scientific information to respond to the Rulemaking Petition, including by stating that agencies in other jurisdictions have come to differing conclusions about how or whether to adopt MCLs for PFAS. (*See id.* at 31.)

Riverkeeper's argument in response rests on its view that the Act imposes a mandatory, statutory duty on DEP to respond to the Rulemaking Petition. Indeed, Riverkeeper states that it is "[the Act,] read in conjunction with [the Environmental Rights Amendment, that] provides a cognizable basis" for Riverkeeper's Count II claim. Accordingly, Riverkeeper argues, the reasoning in *Funk* on which the Agencies rely is factually inapposite, because the respondent agencies in *Funk* did not have a mandatory duty to perform the action sought. Citing the Agencies' responsibilities as trustees under Pennsylvania courts' interpretations of the Environmental Rights Amendment, Riverkeeper argues that agency inaction in the face of egregious environmental and health harms is a breach of the Agencies' recognized fiduciary duties and, thus, is cognizable in an action pursuant to the

16

Environmental Rights Amendment. In response to the Agencies' other arguments—concerning whether DEP has, in fact, complied with its constitutional duties in a timely manner—Riverkeeper argues that such "factual excuses" are not an appropriate basis for preliminary objections. (*See* Riverkeeper's Br. at 49.)

In *Funk*, various individuals filed a petition for review in the nature of a mandamus action seeking to compel Commonwealth agencies to develop a comprehensive plan to reduce greenhouse gas emissions. *Funk*, 144 A.3d at 233-34. The petitioners' claims relied on the Commonwealth's duties under the Environmental Rights Amendment. *Id*. We observed:

> Because it is the Commonwealth, not individual agencies or departments, that is the trustee of public natural resources under the [Environmental Rights Amendment] . . . , [the amendment] must be understood in the context of the structure of government and principles of separation of powers. In most instances, the balance between environmental and other societal concerns is primarily struck by the General Assembly, as the elected representatives of the people, through legislative action.

*Id.* at 235. We explained that, although agencies sometimes must make such balancing judgments themselves, they must always do so within the larger balance that the General Assembly strikes when it passes legislation applicable to the agency. *Id.* In other words, the legislative process produces a statute that already reflects and incorporates agencies' relevant duties under the Environmental Rights Amendment. *Id.* at 249-50. Based on that reasoning, we held that the Environmental Rights Amendment "does not authorize [the agencies] to disturb the legislative scheme" for greenhouse gas regulation established in two relevant statutes—the Pennsylvania Climate Change Act[8] and the Air Pollution Control Act.[9] *Id.* at 250. After examining

---

[8] Act of July 9, 2008, P.L. 935, 71 P.S. §§ 1361.1-.8.

[9] Act of January 8, 1960, P.L. 2119, *as amended*, 35 P.S. §§ 4001-4015.

the mandatory duties they imposed on the agencies, we concluded that the statutes did not require performance of the acts the petitioners sought and that the Environmental Rights Amendment, therefore, also did not do so, and we dismissed the petitioners' mandamus claim. *Id.*

Significantly, Riverkeeper bases its claim in Count II squarely upon the mandatory duty of evaluation it purports to find in the Act and DEP's alleged breach thereof. In other words, the constitutional violation Riverkeeper asserts necessarily implies a violation of the Act. Significantly, Riverkeeper does not argue that the Act itself is somehow inconsistent with the Environmental Rights Amendment or that the Agencies' compliance with the Act would be insufficient to meet their constitutional obligations. Based on our analysis of Count I of the Petition, we have concluded that the Act does not impose any mandatory duty on DEP to respond to the Rulemaking Petition. Thus, this matter is analogous to *Funk*—the relevant statute, which embodies the General Assembly's judgment about the Agencies' duties under the Environmental Rights Amendment, does not require the action sought in the Petition, so the amendment itself does not require that action. Accordingly, Riverkeeper's theory of Count II, in the form in which it is before us now,[10] is not sufficient to state a claim under the Environmental Rights Amendment.

---

[10] Our disposition of Count II should not be understood to foreclose the possibility that a claim under the Environmental Rights Amendment might ripen once the Agencies take further action on the Rulemaking Petition. At that point, the "duty to evaluate," which Riverkeeper purports to find in the Act as critical support for its Count II claim, will no longer be relevant. Instead, and unlike now, the Agencies will have exercised their discretion under the Act, in one way or another, concerning setting MCLs beyond the federal requirements. Only then can we determine whether the Agencies' actions were an *abuse* of that discretion under the Act (and under the Environmental Rights Amendment, to the extent its duties are not coextensive with those under the Act). This is particularly important given our analysis of Count III, below, where we hold that the Agencies are obligated by statute to respond to the Rulemaking Petition, as outlined in the EQB policy. Once the Agencies undertake the necessary response and complete the rulemaking **(Footnote continued on next page…)**

18

Because we so conclude, we need not address the Agencies' argument that, as a matter of fact, they are in compliance with their duties under the Environmental Rights Amendment. We note in passing, however, that the Agencies' factual allegations are not relevant at the preliminary objection stage because we must accept the averments in the Petition as true. *See Meier*, 648 A.2d at 600.

## C. Declaratory Relief (Count III)

The Agencies demur to Count III on the basis of their position that, in Counts I and II, Riverkeeper has failed to state legally sufficient claims, and, therefore, there is no actual controversy remaining to be settled by declaratory judgment. Because of this alleged lack of underlying claims and based on their allegation that the Agencies are in compliance with their duties, the Agencies essentially claim that there is no dispute left for this Court to resolve. In support, the Agencies again cite *Funk*, where we sustained the agencies' preliminary objection to the petitioners' request for declaratory relief after we determined that the petitioners had failed to state a mandamus claim.

In response, Riverkeeper insists that it has an actual controversy with the Agencies based on the underlying claims in Counts I and II and characterizes its actual dispute with the Agencies as relating to the urgency of remediating PFOA contamination. Riverkeeper also states, however, that it "seeks a judicial determination regarding the obligations and liability of DEP *to issue a report in response to DRN's Rulemaking Petition* or to otherwise regulate and abate PFOA contamination in drinking water." (Riverkeeper's Br. at 51 (emphasis added).) Thus, although the regulation of PFOA contamination is the subject matter of the

---

petition process, we can evaluate the constitutional (as well as the statutory) merits of that response and the exercises of discretion it involves.

19

parties' dispute, Riverkeeper explains, throughout its brief, that its actual controversy with DEP essentially concerns process, not substance.[11] (*See, e.g.*, Riverkeeper's Br. at 19 n.13 (explaining that, while method of regulatory action lies within DEP's discretion, DEP is obligated to take *some action* in response to Rulemaking Petition).) In Riverkeeper's view, a declaratory judgment is proper because it "will practically help to end the controversy." (Riverkeeper's Br. at 52 (quoting *Pa. Game Comm'n v. Seneca Res. Corp.*, 84 A.3d 1098, 1103 (Pa. Cmwlth. 2014))).

The Declaratory Judgments Act[12] provides for declaratory judgments "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered." 42 Pa. C.S. § 7541(a). Declaratory relief is limited, however, by certain justiciability concerns, including that a petitioner "must allege an interest which is direct, substantial and immediate, and must demonstrate the existence of a real or actual controversy." *Off. of Governor v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014). In *Funk*, we noted that declaratory relief is appropriate only where the declaratory judgment, if granted, would materially address the actual controversy between the parties, independently of the petitioners' other claims. We stated:

> "[D]eclaratory judgment must not be employed . . . as a medium for the rendition of an advisory opinion which may prove to be purely academic." *Gulnac by Gulnac v. S. Butler Cnty. Sch. Dist. . . . .*, 587 A.2d 699, 701 ([Pa.] 1991). "Courts generally should refuse to grant requests for declaratory judgment where it would not resolve the controversy or uncertainty which spurred the request." *Rendell v. Pa. State Ethics Comm'n.*, 938 A.2d 554, 559 (Pa. Cmwlth. 2007).

---

[11] Consistent with this, at oral argument on this matter, counsel for the Agencies conceded the seriousness of PFOA contamination and emphasized that it was only the manner in which the Agencies must address that serious problem that is at issue.

[12] 42 Pa. C.S. §§ 7531-7541.

20

*Funk*, 144 A.3d at 251. We reasoned that, because the petitioners' underlying mandamus claim failed, granting the requested declaratory judgment might "provide a legal predicate to the success of their mandamus claims, but would otherwise have no independent significance." *Id.* (quoting *Stackhouse v. Pa. State Police*, 892 A.2d 54, 63 (Pa. Cmwlth.), *appeal denied*, 903 A.2d 539 (Pa. 2006)). We also observed that, on the facts in *Funk*, there was "no indication that future litigation between the parties will turn on the questions raised by the petitioners' requests for declaratory relief," and we dismissed the request for declaratory relief on that basis. *Id.*

The instant matter differs significantly from the declaratory relief analysis in *Funk*. There, the petitioners sought to compel agencies to take action, and we found no statutory basis for that request whatsoever. Here, although neither the Act nor the Environmental Rights Amendment compels the Agencies to respond to the Rulemaking Petition, a different statute effectively does require a response. Specifically, Section 1920-A of The Administrative Code of 1929 provides:

> (b) The [EQB] shall have the power and its duties shall be to formulate, adopt and promulgate such rules and regulations as may be determined by the board for the proper performance of the work of [DEP] . . . .
>
> . . . .
>
> (h) *Any person may petition the [EQB]* to initiate a rule making proceeding for the issuance, amendment or repeal of a regulation administered and enforced by [DEP].

(Emphasis added.)

Although Section 1920-A of The Administrative Code of 1929 does not explicitly impose a duty on the Agencies to respond to a petition submitted pursuant to subsection (h) thereof, we conclude that such a duty is present for two reasons. First, the obvious purpose of subsection (h) is to permit the public to influence the

21

Agencies' decisions to create or change regulations. This purpose would be fatally frustrated if the Agencies have no duty under Section 1920-A to evaluate and respond to rulemaking petitions in at least some way. Such a duty is, therefore, necessarily implicit in subsection (h)'s creation of a statutory rulemaking petition process. *See* 1 Pa. C.S. § 1922(1)-(2) (establishing legal presumptions that "General Assembly does not intend . . . result that is absurd, *impossible of execution* or unreasonable" and "intends . . . entire statute to be *effective* and certain." (emphasis added)). Second, the only explanation of *how* and *when* the Agencies respond to subsection (h) rulemaking petitions is the EQB policy, which is self-imposed by the Agencies. Regardless of whether the EQB policy is a binding regulation or merely a statement of policy, it is the only method of responding to rulemaking petitions that the parties have discussed in this matter. The Agencies have identified no other interpretation of, or regulation or policy concerning, the subsection (h) petition process. Instead, the Agencies appear to take the position that, despite their statutory duty to accept (and, therefore, to consider) rulemaking petitions, they may simply pause, indefinitely, in the middle of the rulemaking petition process. Riverkeeper, on the other hand, insists that DEP is bound by the EQB policy to issue a report or other response to the Rulemaking Petition within some finite period of time and alleges in the Petition that DEP has not acted in accordance with its policy.

There is, therefore, an actual controversy between the parties, which is an appropriate subject for declaratory relief. *Gulnac by Gulnac*, 587 A.2d at 701. Furthermore, if granted, a declaration that the Agencies have a duty to engage in—and not frustrate—the *statutory* subsection (h) petition process by following the DEP policy will meaningfully clarify what the Agencies must do and will resolve the

controversy. Such declaratory relief would be independently significant—it would require DEP to respond to the petition, which is all that Riverkeeper seeks at this point in the regulatory process (and is independent of the substance of DEP's response, which is governed by the Act, not the DEP policy). DEP's response to the Rulemaking Petition would also allow the subsection (h) process to move forward and achieve its intended purpose. Thus, unlike in *Funk*, there is a statutory source of obligation on which to base declaratory relief, independent of Riverkeeper's claims in Counts I and II. Accordingly, we conclude that Riverkeeper has stated a claim for declaratory relief in Count III, and we will overrule the Agencies' preliminary objections in the nature of a demurrer thereto.

### D. Attorney's Fees and Costs (Count III)

In addition to their demurrer, the Agencies argue that, because Riverkeeper cites no authority or reason for its request for attorney's fees and costs in Count III, we should either dismiss that claim or require Riverkeeper to replead it with greater specificity. Riverkeeper responds that its request is proper because DEP has acted "arbitrarily and vexatiously" by its persistent failure to issue a report or affirmatively state when it will do so. (Riverkeeper's Br. at 52 n.28.) In support, Riverkeeper cites a decision of this Court in which we held that a litigant was liable for attorney's fees because of its "arbitrary," "dilatory[,] and obdurate" conduct during the pendency of the action. *KIPP Phila. Charter Sch. v. Dep't of Educ.*, 161 A.3d 430, 445 (Pa. Cmwlth. 2017) (*KIPP*), *aff'd sub nom. Richard Allen Preparatory Charter Sch. v. Dep't of Educ.*, 185 A.3d 984 (Pa. 2018).

We came to that conclusion, however, only after emphasizing that "a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties[,] or some other established

23

exception." *Id.* at 443. We then engaged in a thorough discussion of the potential authority for payment of fees in that matter, including a review of the circumstances under which fee awards are authorized pursuant to Section 2503 of the Judicial Code, 42 Pa. C.S. § 2503, in declaratory judgment actions and mandamus actions. *KIPP*, 161 A.3d at 444-45. Here, the Petition itself sets forth no specific basis on which we can judge the legal sufficiency of Riverkeeper's claim for fees and costs, so neither we nor the Agencies can determine how to respond. Accordingly, we will dismiss Count III of the Petition to the extent it requested payment of attorney's fees and costs, and we will allow Riverkeeper leave to replead that portion of Count III with greater specificity, as the Agencies requested, should it choose to do so.

### E. Claims Against the EQB

Finally, the Agencies argue that we should dismiss all counts of the Petition against the EQB because Riverkeeper demands no action of and makes no allegations against the EQB individually. They point out that, in the Petition itself, Riverkeeper admits that "[the] EQB is not accused of direct wrongdoing but is protectively included since it *may* be a necessary and indispensable party." (Agencies' Br. at 35 (quoting Pet. ¶ 24).) They emphasize that DEP—not the EQB—would issue the report and/or response Riverkeeper seeks. Riverkeeper argues in response that the EQB is an indispensable party because, if DEP is required to proceed as Riverkeeper requests, the EQB will be required to cooperate in the regulatory process.

"A party is deemed to be indispensable when 'his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights.'" *Polydyne, Inc. v. City of Phila.*, 795 A.2d 495, 496 (Pa. Cmwlth. 2002) (quoting *Vernon Twp. Water Auth. v. Vernon Twp.*, 734 A.2d 935,

24

938 n.6 (Pa. Cmwlth. 1999)). Here, the remaining claim (Count III) seeks a declaratory judgment concerning the Agencies' obligations to respond to the Rulemaking Petition pursuant to the subsection (h) process and the EQB policy. Although the immediate next step in that process is, as Riverkeeper has made clear, a report to be issued by DEP alone, the EQB is also an active participant in the petition process, both at this stage and at later stages. *See* 25 Pa. Code §§ 23.6 (requiring DEP report to set forth date on which EQB will consider proposed rulemaking and requiring DEP to make presentation at EQB meeting), 23.8 (providing that EQB will consider proposed rulemaking, if any, based on DEP report). As Riverkeeper points out, any relief affecting the rights or obligations of DEP concerning the EQB policy will also affect the rights and obligations of the EQB, and the two Agencies may have distinct positions and interests regarding any forthcoming declaratory relief. (*See* Riverkeeper's Br. at 53-54.) Accordingly, the EQB is an indispensable party, and we will not dismiss it from this matter.

## IV. CONCLUSION

Based on the foregoing analysis, we will sustain the Agencies' preliminary objections in part and overrule them in part. First, with respect to Counts I (the Act) and II (the Environmental Rights Amendment) of the Petition, we will sustain the Agencies' preliminary objections in the nature of a demurrer and dismiss Riverkeeper's claims. With respect to Count III (declaratory relief), we will overrule the preliminary objections in the nature of a demurrer, both as to claims against DEP and as to claims against the EQB. We will, however, sustain the preliminary objection as to Riverkeeper's request for attorney's fees and dismiss the portion of

25

Count III requesting fees and costs and grant Riverkeeper leave to replead that portion of Count III.

_____

P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Delaware Riverkeeper Network,      :
and the Delaware Riverkeeper,      :
Maya van Rossum,               :
                   Petitioners   :
                                :
          v.             :   No. 285 M.D. 2019
                                :
Pennsylvania Department of      :
Environmental Protection of the   :
Commonwealth of Pennsylvania and :
Environmental Quality Board of the :
Commonwealth of Pennsylvania,   :
                  Respondents  :

## **O R D E R**

AND NOW, this 12th day of January, 2021, upon consideration of Respondents' preliminary objections, the preliminary objections are SUSTAINED, IN PART, and OVERRULED, IN PART, as follows:

1.     Respondents' preliminary objections in the nature of a demurrer to Counts I and II of the Petition are SUSTAINED, and Counts I and II of the Petition are DISMISSED.

2.     Respondents' preliminary objection to Count III of the Petition based on insufficient specificity of a pleading is SUSTAINED as to Petitioners' claim for attorney's fees and costs, the portion of Count III requesting attorney's fees and costs is DISMISSED, and Petitioners are hereby granted leave to amend Count III of the Petition in accordance with the attached opinion.

3.     In all other respects, Respondents' preliminary objections are OVERRULED.

4.     Petitioners' amended Petition for Review, should they choose to file one, shall be filed within 30 days of the date of this Order.

_____
P. KEVIN BROBSON, Judge